**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**April 23, 2012**

**TENTH CIRCUIT**

STEVEN RAY THACKER,

      Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

      Respondent-Appellee.

No. 10-5127

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:06-CV-00028-CVE-FHM)**

---

Thomas Kenneth Lee, (Randy A. Bauman, Assistant Federal Public Defender,
with him on the briefs), Assistant Federal Public Defender, Oklahoma City,
Oklahoma, for Petitioner-Appellant.

Jennifer J. Dickson, (E. Scott Pruitt, Attorney General of Oklahoma, with her on
the brief), Assistant Attorney General, Oklahoma City, Oklahoma, for
Respondent-Appellee.

---

Before **BRISCOE,** Chief Judge, **O'BRIEN** and **MATHESON**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

      Petitioner Steven Ray Thacker pled guilty in Oklahoma state court to

charges of first-degree malice aforethought murder, kidnapping, and first-degree

rape.  Following a sentencing hearing, the state trial court sentenced Thacker to death for the murder conviction.  Thacker's death sentence was affirmed on direct appeal, and his requests for state post-conviction relief were denied.  Thacker petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, but was denied relief by the district court.  Thacker filed a notice of appeal and the district court granted him a certificate of appealability on four issues.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's denial of federal habeas relief.

I

*Factual background*

On the morning of December 23, 1999, Thacker, who had just been laid off from his job, devised a plan to rob someone in order to obtain cash to purchase Christmas presents for his wife of a few months, Trena Thacker, and her two children.  Thacker began by reviewing the classified advertisements in the Tulsa newspaper.  After calling several phone numbers listed in the classified ads and considering the locations of the persons who placed those ads, Thacker responded to an advertisement regarding a pool table for sale.  The advertisement had been placed by a woman named Laci Dawn Hill, and it was Hill who spoke with Thacker that morning when he called.  After determining that Hill's home was located in what he regarded as a nice area of Tulsa, Thacker made arrangements with Hill to come to her house later that morning and view the pool table.  "When

2

Ms. Hill allowed [him] admission into her home" later that morning, Thacker "pulled a knife and demanded money." Thacker v. State, 100 P.3d 1052, 1054 (Okla. Crim. App. 2004) (Thacker I). Hill responded that she had no money in her home, "but could get some from an ATM machine." Id. Thacker forced Hill at knife-point to first retrieve her purse from the kitchen, and then forced her outside and into his vehicle. From there, Thacker "took Ms. Hill to a ramshackle cabin in the country" and bound her to a chair. Id. Thacker told Hill he would let her go if she had sex with him. He then forced Hill to have sexual intercourse with him against her will. After raping Hill, Thacker again bound Hill to a chair. Then, concerned that Hill might escape and tell authorities, Thacker removed her from the chair and attempted to choke her to death "with his hands and/or a piece of cloth." Id. "When this proved unsuccessful—due to Ms. Hill's valiant struggle to fend him off—[Thacker] stabbed [her] twice in the chest with his knife." Id. Although neither knife wound was immediately fatal, both wounds penetrated Hill's left lung, resulting in massive internal bleeding and, ultimately, death.

The remaining relevant facts of the crime were outlined in detail by the Oklahoma Court of Criminal Appeals (OCCA) in addressing Thacker's direct appeal:

> [Thacker] left Ms. Hill's lifeless body on the cabin floor, covered by box springs and several mattresses. Authorities found her body six days later. Ms. Hill was disrobed from the waist down,

3

except for one sock. Her sweatshirt and shirt had been pushed up over her head, and her bra, which clasped in the front, had been undone. Her sweat pants and panties were found near her body. The medical examiner found the presence of sperm in Ms. Hill's vagina. He determined Ms. Hill had been wearing panties at or very close to the time of her death and that the panties had remained on her body for several hours after her death.

After killing Ms. Hill, [Thacker] proceeded to go on a horrifying crime spree. He used credit and debit cards he had stolen from Ms. Hill to purchase Christmas gifts for his family. Concerned authorities were looking for him, he fled to Missouri, where he car-jacked a family (an elderly woman, younger woman, and a child) three days after Christmas. A massive manhunt followed and [Thacker] was nearly caught several times. He hid out in the woods for a couple of days and broke into several homes, but was somehow able to stay ahead of police. During one of the burglaries, the homeowner, Forrest Boyd, returned. [Thacker] killed Boyd by stabbing him several times in the back.

[Thacker] fled in Boyd's car and made it to Tennessee before the car broke down. He called a towing company. The unlucky driver, Roy Patterson, also wound up being stabbed and killed by [Thacker], after the credit card [Thacker] used to pay for the tow showed it had been stolen. An arrest followed soon after.

Id. at 1054-55 (internal paragraph numbers and footnote omitted).

*Thacker's trial proceedings*

On December 30, 1999, Thacker was charged by information in the District Court of Mayes County, Oklahoma, Case Number CF-1999-305, with first-degree malice aforethought murder. On February 8, 2000, a first amended information was filed charging Thacker with first-degree malice aforethought murder (Count I), kidnapping (Count II), and first-degree rape (Count III).

On February 25, 2000, the prosecution filed a bill of particulars alleging the

4

existence of three aggravating circumstances: (1) the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution; (2) the existence of a probability that Thacker would commit criminal acts of violence that would constitute a continuing threat to society; and (3) the murder was especially heinous, atrocious, or cruel. A first amended bill of particulars was filed on June 12, 2002, but the substance of the three alleged aggravating circumstances remained the same.

Three attorneys from the Oklahoma Indigent Defense System (OIDS), Silas Lyman II, G. Lynn Burch, and Gretchen Mosley, were appointed to represent Thacker.

On December 2, 2002, the eve of trial, Thacker waived his right to a jury trial and entered a blind guilty plea to the crimes charged in the first amended information.[1] In a handwritten addendum to the written plea of guilty, Thacker wrote as follows:

<u>Ct. 1</u>

I took Mrs. Hill from her home to Locust Grove where I strangled and stabbed her. I killed Mrs. Hill on December 23, 1999.

<u>Ct. 2</u>

I took Mrs. Hill by force from her home and took her to Locust Grove. I took Mrs. Hill to a remote cabin where nobody could find

---

[1] At that point in time, Thacker had already been convicted by a jury in Tennessee and sentenced to death.

5

her.

Ct. 3

I forced Mrs. Hill to have sexual intercourse with me and that included penetration.

All the charges are true and were committed on or around December 23, 1999 in Mayes County.

I am pleading guilty to the charges listed because I am in fact guilty and I do not wish to cause the victims [sic] family and friends more pain by forcing them to endured [sic] a long drawn out trial. I have caused enough pain and heartache and I [sic] am deeply sorry and want to put this to an end for everyone.

State ROA, Vol. C at 509.

At the state trial court's direction at the accompanying plea hearing,[2]

Thacker elaborated on his handwritten statements:

THE COURT: Mr. Lyman [defense counsel], I would like for you to inquire of Mr. Thacker more of the details and what he was thinking when this happened, sir.

MR. LYMAN: Yes, Your Honor, thank you. First of all, Steven, this is something that you want to do, isn't it?

DEFENDANT THACKER: Yes, sir.

MR. LYMAN: Regarding Count 1 of the death, the death of Mrs. Hill, would you in your own words tell the court how it came about that you came to her home that day?

---

[2] On December 2, 2002, following Thacker's completion of the plea agreement, but prior to the plea hearing, the state trial court, at the request of Thacker's counsel, conducted an in camera hearing. During that hearing, Thacker testified on the record regarding his decision to plead guilty and waive his right to be sentenced by a jury.

6

DEFENDANT THACKER: I was looking in the newspaper ad and I saw an address for a pool table and I called her house and she give me directions to her house to come and look at a pool table.

MR. LYMAN: When you made that call and arrangements, what was your plan?

DEFENDANT THACKER: I had intended to rob whoever was home.

MR. LYMAN: Did you – and had you ever met her before?

DEFENDANT THACKER: No.

MR. LYMAN: Did you know when you went there it there would be anybody else present but her?

DEFENDANT THACKER: No.

MR. LYMAN: Did you go there?

DEFENDANT THACKER: Yes.

MR. LYMAN: Did you go into her home?

DEFENDANT THACKER: Yes.

MR. LYMAN: Did you go look at the pool table.

DEFENDANT THACKER: Yes, I did.

MR. LYMAN: Did you abduct her and take her from her home without her permission?

DEFENDANT THACKER: Yes.

MR. LYMAN: Would you tell the court a little bit how that came about?

DEFENDANT THACKER: I pulled a knife on her and asked her to give me her money and she informed me she didn't have any

7

money at the house but she had an ATM card and so I forced her to go with me to use the ATM card.

MR. LYMAN: Forced her by taking her to the car you came in?

DEFENDANT THACKER: Yes.

MR. LYMAN: And did you hold onto her?

DEFENDANT THACKER: Yes.

MR. LYMAN: Did you use your knife?

DEFENDANT THACKER: Yes.

MR. LYMAN: At that time in a menacing way?

DEFENDANT THACKER: Right.

MR. LYMAN: You didn't stab her at her home?

DEFENDANT THACKER: No.

MR. LYMAN: And where did you take her?

DEFENDANT THACKER: To Locust Grove, there was a remote cabin in Locust Grove.

MR. LYMAN: You were familiar with that cabin before?

DEFENDANT THACKER: Yes.

MR. LYMAN: Is that then the Marge Fry?

DEFENDANT THACKER: Yes.

MR. LYMAN: Acreage or home place?

DEFENDANT THACKER: Yes.

MR. LYMAN: In your mind Ms. Hill didn't want to go with you, did she?

DEFENDANT THACKER: No, she didn't.

MR. LYMAN: And you took her to that cabin – In effect, Your Honor, we're going to end up probably covering the elements of the other two.

THE COURT: And we'll let the record show that the elements of all three counts will be shown here in this inquiry.

MR. LYMAN: When you took her to the home, did you take her there wanting to make sure people didn't know where she was at?

DEFENDANT THACKER: Yes.

MR. LYMAN: Now, at the cabin what happened?

DEFENDANT THACKER: I raped Mrs. Hill at the cabin.

MR. LYMAN: And by rape would you tell the court what that means to you?

DEFENDANT THACKER: We had sexual intercourse and penetration.

MR. LYMAN: And that was against her will?

DEFENDANT THACKER: Yes.

MR. LYMAN: Did you threaten her?

DEFENDANT THACKER: Yes.

MR. LYMAN: Did you promise that you would let her go if you, if she would do that?

DEFENDANT THACKER: Yes, I did.

MR. LYMAN: And you had sexual intercourse with her?

9

DEFENDANT THACKER: Yes.

MR. LYMAN: Now, after that what happened?

DEFENDANT THACKER: I tied her to a chair and was going to leave and I got scared and panicked that she would get away and run and tell somebody or get help, that I would get in trouble and get caught.

MR. LYMAN: So what did you do?

DEFENDANT THACKER: So then I went back in and I killed her.

MR. LYMAN: The state's information indicates that part of the method of her dying was strangulation. Did you strangle her?

DEFENDANT THACKER: Yes.

MR. LYMAN: Did she resist?

DEFENDANT THACKER: Yes.

MR. LYMAN: The information also indicates that she died from mortal injuries as a result of being stabbed more than once, twice I believe.

DEFENDANT THACKER: Yes.

MR. LYMAN: Did you stab her?

DEFENDANT THACKER: Yes.

MR. LYMAN: Did she die?

DEFENDANT THACKER: Yes.

MR. LYMAN: The taking to this cabin, raping her and then eventually killing her, did that happen in Mayes County?

DEFENDANT THACKER: Yes, it did.

10

MR. LYMAN: And did all of those things occur on the same day as the day you went to look at the pool table?

DEFENDANT THACKER: Yes.

Tr. of Plea, Dec. 2, 2002, at 17-22. The state trial court, after questioning Thacker further about his admissions, found that Thacker was guilty beyond a reasonable doubt of all three charged crimes. Id. at 27-28.

The subject of Thacker's capacity, both at the time of the crimes and at the time of his plea, was also addressed during the plea hearing (as well as during an in camera hearing that occurred immediately prior to the plea hearing). To begin with, the state trial court, after detailing Thacker's mental health history, questioned Thacker and his attorneys about Thacker's understanding of the proceedings against him:

> THE COURT: Okay. Because of any of that circumstance being diagnosed as bipolar, taking lithium, not taking lithium, having gone to some sort of a mental health facility in Huntington, West Virginia, having drug rehab in Florida at the age of 16, do you believe any of those things affect your ability to understand and comprehend the nature and consequences of this hearing today?
>
> DEFENDANT THACKER: No, sir.
>
> THE COURT: I'll ask your counsel, Mr. Lyman, do you and the rest of the defense team believe that Mr. Thacker is competent to understand what's going on here today?
>
> DEFENDANT THACKER: Yes, Your Honor.

Id. at 9. Thacker's counsel subsequently addressed, albeit briefly, the issue of Thacker's competence at the time he committed the charged crimes:

11

MR. LYMAN: You know and I want you to think back when this occurred did you know what you were doing was wrong?

DEFENDANT THACKER: Yes.

MR. LYMAN: You know why you did it?

DEFENDANT THACKER: No.

Id. at 23-24.

At the time of his plea hearing, Thacker also waived his right to a jury trial on the three aggravating circumstances alleged by the State. Accordingly, a non-jury sentencing trial was held in the case beginning on December 17, 2002. At the conclusion of the evidence, the state trial court found that all three of the alleged aggravating circumstances had been proven beyond a reasonable doubt, and in turn found that the aggravating circumstances outweighed the mitigating evidence presented by Thacker.[3] Based upon these findings, the state trial court determined the appropriate sentence for the murder conviction was death. The trial court formally sentenced Thacker on December 23, 2002, to death for the murder conviction, ten years' imprisonment for the kidnapping conviction, and fifty years' imprisonment for the rape conviction.

*Thacker's direct appeal*

On January 2, 2003, one of Thacker's trial attorneys, OIDS attorney

---

[3] Thacker presented nine mitigation witnesses, including a forensic psychiatrist, three family members (including his mother, sister, and an aunt), a former girlfriend, two acquaintances, a minister, and a jail administrator.

Gretchen Mosley, filed a notice of intent to appeal on his behalf. On June 13, 2003, Mosley filed a petition in error announcing Thacker's intent to perfect a direct appeal of his sentences. On March 25, 2004, Mosley filed an appellate brief on Thacker's behalf asserting two propositions of error. Proposition One asserted that Thacker's death sentence should be vacated or modified on grounds that the trial court never acquired jurisdiction over the aggravating circumstances alleged by the prosecution because those aggravating circumstances were not charged in an information or indictment, subjected to adversarial testing in a preliminary hearing, nor determined to probably exist by a neutral and detached magistrate. Proposition Two asserted that the interpretation of the heinous, atrocious, or cruel aggravating circumstance adopted by the Oklahoma state courts violated the Eighth and Fourteenth Amendments by failing to properly channel the factfinder's discretion in imposing the death penalty.

Thacker waived his right to oral argument before the OCCA. On October 21, 2004, the OCCA issued an opinion affirming the judgments and sentences. Thacker I, 100 P.3d at 1060.

Thacker filed a petition for writ of certiorari with the United States Supreme Court on January 18, 2005. That petition was denied on March 7, 2005. Thacker v. Oklahoma, 544 U.S. 911 (2005).

*Thacker's first application for state post-conviction relief*

In February 2005, Thacker, represented by new counsel, filed an

13

application for state post-conviction relief raising three issues: (1) ineffective assistance of trial counsel for failing to present compelling and relevant mitigating evidence at the sentencing hearing; (2) the state trial judge allowed victim impact evidence to play a significant role in the sentencing deliberations and, specifically, the weighing of aggravating and mitigating circumstances; and (3) ineffective assistance of appellate counsel for failing to raise the issue set forth in proposition two. On September 13, 2005, the OCCA denied post-conviction relief in a published opinion. Thacker v. State, 120 P.3d 1193 (Okla. Crim. App. 2005) (Thacker II).

*Thacker's initiation of these federal habeas proceedings*

Thacker initiated these federal habeas proceedings on January 17, 2006, by filing a motion for appointment of counsel. The district court granted that motion and appointed counsel for Thacker on January 19, 2006.

On September 8, 2006, Thacker filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition asserted ten grounds for relief: (1) trial counsel was ineffective during pre-plea discussions, resulting in an unknowing and involuntary guilty plea, and for failing to file the proper and necessary paperwork to preserve Thacker's right to file a certiorari appeal; (2) Thacker was denied equal protection and due process of law because the Oklahoma courts failed to follow established procedures to determine whether he desired an appeal; (3) Thacker was denied due process of law because the state

trial court considered information of which Thacker was unaware and had no opportunity to deny or explain; (4) Thacker's execution would violate the Eighth Amendment prohibition against cruel and unusual punishment because Thacker suffered from a severe mental disorder or disability at the time of his crimes; (5) trial counsel was ineffective for failing to present available mitigating evidence; (6) the admission of victim impact evidence, which explicitly called for Thacker's execution, violated Thacker's right to a fundamentally fair sentencing proceeding; (7) the state trial court, in balancing the aggravating and mitigating circumstances, gave inappropriate weight to the victim impact evidence, in violation of the Eighth Amendment; (8) the heinous, atrocious, or cruel aggravating circumstances, as defined by the Oklahoma courts, violated the Eighth and Fourteenth amendments by failing to properly channel the fact finder's discretion in imposing the death penalty; (9) cumulative error; and (10) Thacker's execution would violate the Eighth Amendment because he is incompetent to be executed.

*Thacker's second and third applications for state post-conviction relief*

While his federal habeas petition was pending, Thacker filed a second application for post-conviction relief with the OCCA in September 2006. In Proposition One of that application, Thacker alleged he was denied due process of law due to a "strong possibility" that the state trial judge, Judge James Goodpaster, considered or relied upon information of which Thacker was unaware

15

and had no opportunity to explain or deny. The first such piece of information was the filing of a civil lawsuit against Thacker in July 2000 by Thacker's then-wife, Trena, alleging that Thacker had sexually molested and abused his minor stepdaughter. That case was assigned to Judge Goodpaster. Although the civil case was eventually dismissed, Thacker alleged that Judge Goodpaster likely considered the unadjudicated claims at the time he sentenced Thacker in the criminal proceedings. Thacker also alleged, based upon an ex parte discussion his post-conviction counsel, Vicki Ruth Adams Werneke, allegedly had with Judge Goodpaster, that Judge Goodpaster was of the opinion that bipolar disorder was not a serious mental illness and thus treated Thacker's bipolar disorder as an aggravating, rather than a mitigating, circumstance at the time of sentencing.

In Proposition Two of his second application, Thacker claimed that his execution would violate the Eighth Amendment's prohibition against cruel and unusual punishment because he suffered from a severe mental disorder, i.e. bipolarism, at the time he committed the crimes. In Proposition Three, Thacker claimed that his appellate counsel was ineffective for failing on direct appeal to allege error with respect to the claims presented in Propositions One and Two of the second application for post-conviction relief. In Proposition Four, Thacker claimed that his previous post-conviction counsel was ineffective for failing to raise the issues asserted in Propositions One through Three.

Thacker filed a motion for evidentiary hearing in connection with his

16

second application for post-conviction relief, requesting "an evidentiary hearing on any controverted, previously unresolved issues of fact that m[ight] arise in connection with his second application." Motion at 1.

In December 2006, Thacker filed a third application for post-conviction relief with the OCCA asserting a single proposition for relief, i.e., that the state trial judge's refusal to consider Thacker's bipolar disorder as a mitigating factor at the time of sentencing violated his rights under the Eighth and Fourteenth Amendments.

On August 31, 2007, the OCCA issued an opinion denying Thacker's second and third applications for post-conviction relief.[4]

*The conclusion of the federal habeas proceedings in district court*

Thacker filed an amended federal habeas petition on November 29, 2007. The amended petition did not add any additional claims, but instead amended slightly two of the claims contained in the original petition (Claim Three, which alleged that the state trial judge considered information of which Thacker was unaware, and Claim Four, which alleged that Thacker's execution would violate the Eighth Amendment because Thacker suffered from a severe mental disorder or disability at the time he committed his crimes).

On September 2, 2010, the district court issued an opinion and order

---

[4] Thacker's federal habeas proceedings were held in abeyance during the pendency of his second and third applications for state post-conviction relief.

denying Thacker's petition. Thacker filed a notice of appeal and a motion for certificate of appealability (COA) as to four of the ten issues asserted in his amended federal habeas petition. The district court granted Thacker's motion for COA.

II

Our review of Thacker's appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our

18

abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

III

*Proposition One: Evidence considered and/or not considered by the trial judge*

In Proposition One of his appellate brief, Thacker contends that his due process rights were violated at his sentencing hearing because the state trial judge, Judge Goodpaster, "had information he should not have considered and [in addition] was unable or refused to give due consideration to . . . Thacker's mental illness as a mitigating factor." Aplt. Br. at 15. In support of this contention, Thacker first notes that "[a] civil lawsuit [filed by his ex-wife Trena in July 2000] falsely charging . . . Thacker with child sexual molestation was, unbeknownst to . . . Thacker, pending before Judge Goodpaster" at the time of the sentencing hearing. Id. And, Thacker asserts, Judge Goodpaster's consideration of "this information in sentencing" was unconstitutional because Thacker "ha[d] no opportunity to deny or explain." Id. at 16. Thacker also asserts that,

19

"unbeknownst to [him], Judge Goodpaster viewed bipolar disorder . . . negatively and as something used as an excuse by those who suffer from it." Id. Although Thacker concedes that Judge Goodpaster submitted an affidavit denying bias, Thacker asserts that Judge Goodpaster acknowledged in his affidavit that "he did not give the bipolar evidence mitigating effect." Id. Thacker in turn contends that Goodpaster thus failed "to meaningfully consider the mitigating evidence presented." Id.

*a) Applicable clearly established federal law*

Thacker contends that two Supreme Court decisions supply the clearly established federal law applicable to Proposition One. With respect to his assertion that Judge Goodpaster considered prejudicial extraneous information in making his sentencing decision, Thacker points to Gardner v. Florida, 430 U.S. 349 (1977). And, with respect to his contention that Judge Goodpaster failed to meaningfully consider evidence of Thacker's bipolar disorder, Thacker points to Eddings v. Oklahoma, 455 U.S. 104 (1982). In Gardner, the petitioner was convicted by a Florida jury of the first-degree murder of his wife. At the subsequent sentencing hearing, the jury expressly found that the mitigating circumstances alleged by the petitioner (his consumption of a vast quantity of alcohol preceding the crime) outweighed the aggravating circumstances (that the murder was especially heinous, atrocious or cruel) and advised the trial court to impose a life sentence. At the sentencing hearing, however, the trial court

20

sentenced the petitioner to death. In doing so, the trial court expressly stated that it had relied, in part, on a presentence investigation report (PSR). And it was uncontroverted that the PSR "contained a confidential portion which was not disclosed to defense counsel." 430 U.S. at 353.

The petitioner appealed to the Florida Supreme Court, arguing that the trial court had erred in considering the confidential portion of the PSR in making its sentencing decision. The Florida Supreme Court affirmed the sentence, stating it had carefully reviewed the record. "The record on appeal, however, did not include the confidential portion of the" PSR. Id. at 353-54. The Supreme Court subsequently "granted certiorari . . . to consider the constitutionality of the trial judge's use of a confidential" PSR. Id. at 354.

In addressing this issue, the Supreme Court noted at the outset that a majority of the members of the Court had "expressly recognized that death is a different kind of punishment from any other which may be imposed in this country," id. at 357, and that, consequently, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," id. at 358. The Supreme Court then addressed and rejected each of the "justifications offered by the State for a capital-sentencing procedure which permits a trial judge to impose the death sentence on the basis of confidential information which is not disclosed to the defendant or his counsel." Id. In particular, the Supreme Court

21

rejected the State's argument "that trial judges can be trusted to exercise their discretion in a responsible manner, even though they may base their decisions on secret information." Id. at 360. This argument, the Supreme Court held, "rests on the erroneous premise that the participation of counsel is superfluous to the process of evaluating the relevance and significance of aggravating and mitigating facts." Id. "Our belief that debate between adversaries is often essential to the truth-seeking function of trials," the Supreme Court held, "requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases." Id. The Supreme Court also held that, "[e]ven if it were permissible to withhold a portion of the report from a defendant, and even from defense counsel, pursuant to an express finding of good cause for nondisclosure, it would nevertheless be necessary to make the full report a part of the record to be reviewed on appeal." Id. at 360-61. The Supreme Court explained that, "[s]ince the State must administer its capital-sentencing procedures with an even hand, it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." Id. at 361. Ultimately, the Supreme Court "conclude[d] that [the] petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." Id. at 362.

In Eddings, the petitioner, at the age of 16, shot and killed an Oklahoma

22

Highway Patrol officer. Petitioner was charged with murder in the first degree and was certified to stand trial as an adult. The state trial judge found petitioner guilty upon a plea of nolo contendere. A sentencing hearing was subsequently held before the state trial judge. The state alleged the existence of three aggravating circumstances and presented evidence in support of those alleged circumstances. Petitioner, in turn, presented mitigating evidence regarding his troubled youth. At the conclusion of all the evidence, the state trial judge "found that the State had proved each of the three alleged aggravating circumstances beyond a reasonable doubt," and that the petitioner's "youth was a mitigating factor of great weight." 455 U.S. at 108. But the state trial judge "would not consider in mitigation the circumstances of [the petitioner's] unhappy upbringing and emotional disturbance." Id. at 109. "Finding that the only mitigating circumstance was [petitioner's] youth and finding further that this circumstance could not outweigh the aggravating circumstances present, the [state trial judge] sentenced [petitioner] to death." Id. On direct appeal, the OCCA "agreed with the [state] trial [judge] that only the fact of [petitioner's] youth was properly considered as a mitigating circumstance," and it consequently "affirmed the sentence of death." Id.

The Supreme Court granted certiorari, reversed "the judgment . . . to the extent that it sustain[ed] the imposition of the death penalty," and remanded the case for further proceedings. Id. at 117. In doing so, the Supreme Court stated

23

that it was applying the rule first announced in <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978), i.e., "'that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, <u>as a mitigating factor</u>, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" <u>Id.</u> at 110 (quoting <u>Lockett</u>, 438 U.S. at 604) (emphasis in original). And the Supreme Court explained that it was clear from the statements at sentencing that the state trial judge "did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that <u>as a matter of law</u> he was unable even to consider the evidence." <u>Id.</u> at 113 (emphasis in original). The Supreme Court further noted that the OCCA "took the same approach," finding "that the evidence in mitigation was not relevant because it did not tend to provide a legal excuse from criminal responsibility." <u>Id.</u> The Supreme Court concluded "that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in <u>Lockett</u>." <u>Id.</u> "Just as the State may not by statute preclude the sentencer from considering any mitigating factor," the Supreme Court held, "neither may the sentencer refuse to consider, <u>as a matter of law</u>, any relevant mitigating evidence." <u>Id.</u> at 113-14 (emphasis in original). In sum, the Supreme Court held, "[t]he sentencer, and the [OCCA] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." <u>Id.</u> at 114-15.

24

*b) The OCCA's ruling on the issue*

The allegations contained in Proposition One were raised for the first time in Thacker's federal habeas petition filed in September 2006, "then presented for exhaustion in a second state post-conviction application" filed later that same month. Aplt. Br. at 19. Along with his second application for state post-conviction relief, Thacker filed a motion for an evidentiary hearing, as well as supporting affidavits. In particular, Thacker submitted an affidavit from Vicki Ruth Adams Werneke, the attorney who represented him in his first application for state post-conviction relief. In her affidavit, Werneke stated, in pertinent part:

> The main theme of Mr. Thacker's defense at his sentencing was that he suffered from Bipolar Disorder and that his mental illness played a large role in why he committed his crimes. During the course of my representation of Mr. Thacker, I interviewed Judge James Goodpaster, the judge who sentenced Mr. Thacker to death. Judge Goodpaster informed me that because of his experience as a judge, he discounted Bipolar Disorder as an excuse for criminal behavior and bad conduct. He also stated he had a family member who claimed to suffer from Bipolar Disorder who used being bipolar as an excuse for inappropriate behavior. Despite my request, Judge Goodpaster refused to sign an affidavit detailing our conversation.

Second Application for Post-Conviction Relief, Att. 8 at 1, ¶ 4 (internal paragraph number omitted).

Respondent moved to dismiss Thacker's second application (as well as his third application) and included with it an affidavit from Judge Goodpaster. Judge Goodpaster addressed, in pertinent part, the allegations made by Werneke:

> I have read copies of affidavits which appear to have been executed

25

by Vicki Ruth Adams Werneke and Lisa McCalmont. . . . I strongly disagree with many of the statements contained therein.

* * *

I have never stated that I categorically discount bipolar disorder as a mitigating factor in regard to criminal behavior or bad conduct. Specifically, with regard to Thacker's case, I did not discount Thacker's evidence that he suffered from bipolar disorder because of a personal bias against persons diagnosed with the disorder or because of my experiences as a judge or with a late family member who claimed to have bipolar disorder. Rather, as reflected in the record, I was not persuaded by the bipolar disorder evidence at Thacker's trial because the psychiatrist who testified on Thacker's behalf also testified that Thacker knew right from wrong at the time he abducted, raped, and killed LacI Dawn Hill and that he was legally competent at the time of the trial.

I do not recall being asked by Ms. Werneke to execute an affidavit regarding my conversation with her. I normally would not agree to do so had I been asked, however.

Respondent's Motion to Dismiss Third Application for Post-Conviction Relief, Exh. A at 1-2, ¶¶ 3, 5, and 6 (internal paragraph numbers omitted).

The OCCA, on August 31, 2007, issued an opinion denying Thacker's second application for state post-conviction relief. In doing so, the OCCA rejected the allegations now asserted in Proposition One:

There are several obvious flaws with Petitioner's claim [that Judge Goodpaster may have considered the allegations of sexual abuse]. First, the factual basis for this claim was available to both trial counsel and Petitioner's previous post-conviction counsel. As such, the post-conviction act does not grant this Court authority to review it. Secondly, even if Petitioner could somehow get in the door (via his claim that his trial counsel was ineffective for failing to raise this issue), his previous post-conviction counsel failed to raise it also. As such, it is waived.[fn]

26

FN.  Besides, even if the claim was "unavailable" and assuming, arguendo, that counsel at some level was ineffective for failing to raise the issue, the claim itself fails to establish by clear and convincing evidence that, but for the alleged error, the trial judge would not have rendered the death penalty.  That Petitioner may have committed sexual abuse is no worse than the egregious facts of this case, involving grisly murders, kidnappings, rape, etc.  The facts of this case do not present a close question on the validity of the sentencing decision.

Nevertheless, we also point out other flaws in this claim.  First, Petitioner admits he was aware of the lawsuit and filed a response to it.  He was represented by counsel at this time, and he would be responsible for telling the attorneys in his criminal trial about the pending matter.  Presumably, he did.

Secondly, we have no real information whether or not the sexual abuse claims were true.  If they were, then Petitioner was hardly prejudiced by any alleged knowledge a trial judge may have had in regard to the as-yet unresolved claim.  Third, as a judge, Judge Goodpaster is presumed to have known the law and to have followed it.  The record reveals he is a thorough and professional trial judge.  We highly doubt he would have based his sentencing decision upon unadjudicated claims not raised in the case, rather than the known facts, which were especially cruel.  Fourth, Petitioner has no firm evidence that the trial judge relied at all upon this matter or was even aware of it.  In Judge Goodpaster's own affidavit, filed in the federal lawsuit and attached to the third post-conviction application, he formally denies any conscious awareness of the allegations in that domestic case and that he would not have considered them if he was aware.

And finally, any other judge possibly "could have known" about the matter, as it was reported at least twice in the Tulsa World.

Petitioner further claims, based upon ex parte hearsay discussions his post-conviction counsel had with Judge Goodpaster, that the trial judge was of the opinion that bipolar disorder was not a serious mental illness and that said evidence was treated by said judge as aggravating, rather than mitigating.  Petitioner claims he

27

was "unaware" of the trial judge's positions on these matters. This claim, however, is refuted by Judge Goodpaster's own affidavit, which states he did not discount such evidence in sentencing Petitioner.

Proposition One is, therefore, without merit.

OCCA's Opinion Denying Second and Third Applications for Post-Conviction Relief at 6-8.

*c) Thacker's challenge to the OCCA's ruling*

In this appeal, Thacker challenges as unreasonable the OCCA's rejection of his allegations. Because there are two distinct allegations, we shall proceed to address them separately.

*1. Alleged consideration of sexual abuse allegations*

As noted, the OCCA's primary basis for rejecting Thacker's claim that Judge Goodpaster improperly considered the sexual abuse allegations was that Thacker had waived the claim by failing to raise it, at a minimum, in his first application for post-conviction relief.[5] More specifically, the OCCA found that

---

[5] As respondent notes in his appellate response brief, we must acknowledge and apply the OCCA's procedural bar ruling, even though the OCCA, on an alternative basis, briefly addressed and rejected the merits of Thacker's claim. See Coleman v. Thompson, 501 U.S. 722, 733 (1991) (noting that a state court can look to federal law as an alternative holding, so long as it clearly and expressly indicates that its decision is based on bona fide separate, adequate and independent state law grounds); Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (holding that "the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law" "in an *alternative*

(continued...)

28

Thacker himself was aware of the lawsuit, and that, consequently, the claim was available to his trial counsel[6], appellate counsel, and post-conviction counsel, but was not raised until his second application for post-conviction relief. In the instant appeal, Thacker does not dispute the OCCA's factual findings relevant to the waiver issue (e.g., that he was personally aware of the civil lawsuit). But he asserts there are "a number of reasons why that state procedural default did not create an enforceable federal procedural bar." Aplt. Br. at 19. "Among those reasons," he asserts, "was that neither independence [n]or adequacy of the waiver was established, particularly in light of the rule in Valdez v. State, 46 P.3d 703 (Okla. Crim. App. 2002), allowing full review and relief anytime the broadly defined interests of justice warrant, and the OCCA's inconsistency in defaulting second post-conviction claims." Aplt. Br. at 19-20.

"[F]ederal habeas review . . . is barred" in any case "in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule[,] . . . unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

---

[5](...continued)
holding") (italics in original).

[6] According to the record, Thacker's trial attorneys were aware of the civil suit, but apparently were not aware that Judge Goodpaster was the presiding judge in the case.

29

fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

"If a particular claim was 'defaulted in state court on an independent and adequate state procedural ground,' we recognize the state courts' procedural bar ruling and do not address the claim on the merits 'unless cause and prejudice or a fundamental miscarriage of justice is shown.'" Johnson v. Champion, 288 F.3d 1215, 1223 (10th Cir. 2002) (quoting Maes v. Thomas, 46 F.3d 979, 985 (10th Cir. 1995)). To be independent, the procedural ground must be based solely on state law. English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998). To be adequate, the procedural ground "must be strictly or regularly followed and applied evenhandedly to all similar claims." Sherrill v. Hargett, 184 F.3d 1172, 1174 (10th Cir. 1999).

Although Thacker contends that the OCCA's waiver ruling was not based on an independent state procedural ground, he is clearly mistaken. In concluding that Thacker's claim was waived, the OCCA expressly discussed and applied the provisions of Oklahoma's amended Post-Conviction Procedure Act, Okla. Stat. tit. 22 § 1089, and its strict limitations on applications for post-conviction relief filed by capital prisoners. Thus, there is simply no doubt that the OCCA's waiver ruling rested exclusively on Oklahoma state law.

Thacker also contends that the state procedural ground relied upon by the OCCA was inadequate because the OCCA, on one notable occasion, ignored the

30

otherwise-applicable state procedural rules and allowed a capital defendant

(specifically a Mexican citizen) to assert in a subsequent application for post-

conviction relief a claim that could have been raised on direct appeal or in his

first application for post-conviction relief.  Valdez, 46 P.3d at 710-11 (granting

subsequent application for post-conviction relief on the basis of a violation of the

Vienna Convention on Consular Relations due to state's failure to notify

petitioner of right to communicate with Mexican consular officials).  Thacker also

contends that the OCCA has been "inconsisten[t] in defaulting second post-

conviction claims."  Aplt. Br. at 20.

Valdez aside, the OCCA's "actual application of the particular procedural

default rule [at issue] to all similar claims has been evenhanded in the vast

majority of cases."  Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995).  Only in

Valdez and approximately three other cases (one of which was unpublished) has

"the OCCA overlooked [a] procedural default in a second or successive state post-

conviction application," and thus Valdez is "insufficient to overcome Oklahoma's

regular and consistent application of [its] procedural-bar rule in the 'vast majority

of cases.'"  Spears v. Mullin, 343 F.3d 1215, 1254-55 (10th Cir. 2003) (quoting

Maes, 46 F.3d at 986); see Malicoat v. State, 137 P.3d 1234, 1235 (Okla. Crim.

App. 2006) (treating inmate's objection to setting of an execution date, on the

grounds that Oklahoma's execution protocol violated the Eighth Amendment, as a

subsequently filed application for capital post-conviction review and agreeing to

31

consider it on the merits because the issue had never before been addressed); Slaughter v. State, 108 P.3d 1052, 1054 (Okla. Crim. App. 2005) (considering and rejecting claims of actual innocence raised in third application for post-conviction relief). And, although Thacker asserts that there have been other cases in which the OCCA has been inconsistent in its application of the procedural bar, he fails to cite to a single such case, aside from Valdez.

Moreover, assuming that Valdez created a discretionary exception to the otherwise-applicable procedural bar rule (prohibiting the assertion of certain claims in successive applications for post-conviction relief), this does not necessarily render the procedural bar rule "inadequate for purposes of the adequate state ground doctrine." Beard v. Kindler, 130 S. Ct. 612, 618 (2009). "To the contrary, a discretionary rule can be 'firmly established' and 'regularly followed'—even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Id.; see Walker v. Martin, 131 S. Ct. 1120, 1128 (2011) (concluding that California state rule applying time limitations to state habeas petitions, "although discretionary, me[t] the 'firmly established' criterion").

Thus, in sum, we must recognize the OCCA's waiver ruling and treat the claim as procedurally barred for purposes of federal habeas review.

As a final matter, Thacker contends that the federal district court in this case should have conducted an evidentiary hearing on his claim. Aplt. Br. at 19-

32

20.  More specifically, he contends that respondent, "[b]y submitting Judge Goodpaster's affidavit, . . . created a material dispute of fact," id. at 19, and "[t]he appropriate course would have been to conduct an evidentiary hearing at which [he] would have [had] the opportunity to refresh Judge Goodpaster's recollection and support his claim," id. at 20.  Because, however, Thacker's claim is procedurally barred, the district court did not err in failing to conduct an evidentiary hearing.  See Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

*2. Treatment of evidence of Thacker's bipolar disorder*

As for the OCCA's rejection of Thacker's claim that Judge Goodpaster disregarded evidence of Thacker's bipolar disorder, or treated such evidence as an aggravating circumstance, Thacker contends in this appeal that the OCCA's decision was "unreasonable and entirely contrary to . . . Judge Goodpaster's affidavit as a whole[,] which confirms Judge Goodpaster did discount the bipolar evidence."  Aplt. Br. at 29.  More specifically, Thacker asserts that Judge Goodpaster's affidavit, considered as a whole, establishes that Judge Goodpaster "limited the force of the [bipolar] evidence to the considerations of competency and sanity."  Id.  And such a limitation, Thacker argues, "was contrary . . . to the principles of Eddings."  Id. at 30.

Unlike the first of the two claims asserted in Proposition One, this second

33

claim was not rejected by the OCCA on the basis of waiver or procedural bar, but

rather on the merits:

> Petitioner further claims, based upon ex parte hearsay discussions his post-conviction counsel had with Judge Goodpaster, that the trial judge was of the opinion that bipolar disorder was not a serious mental illness and that said evidence was treated by said judge as aggravating, rather than mitigating. Petitioner claims he was "unaware" of the trial judge's positions on these matters. This claim, however, is refuted by Judge Goodpaster's own affidavit, which states he did not discount such evidence in sentencing Petitioner.

OCCA's Opinion Denying Second and Third Applications for Post-Conviction

Relief at 7-8. The OCCA also rejected Thacker's assertion that Judge Goodpaster

"refus[ed] to consider [his] mental illness as a mitigating factor," concluding that

"this [wa]s a strained reading of [Judge Goodpaster's] affidavit, one that [w]as

not fairly supported by the record." Id. at 10.

In the instant appeal, Thacker concedes that Judge Goodpaster, in his

affidavit, "den[ied] that he discounted . . . Thacker's [bipolar disorder] mitigation

evidence because of personal bias." Aplt. Br. at 22. But Thacker continues to

argue, as he did before the OCCA, that Judge Goodpaster "admitted that he gave

the evidence no meaningful mitigating effect because it did not provide a legal

defense to the crime." Id. at 22-23. More specifically, Thacker contends that

Judge Goodpaster "admit[ted] that the failure of the [bipolar disorder] evidence to

establish incompetency or a defense of insanity rendered it essentially useless to .

. . Thacker in mitigation." Id. at 24. And Thacker attacks the OCCA's denial of

34

this claim as unreasonable, arguing that "Judge Goodpaster's affidavit as a whole . . . confirms Judge Goodpaster did discount the bipolar evidence" by "limit[ing] the force of the evidence to the considerations of competency and sanity." Aplt. Br. at 29. Thacker also argues that "[t]he OCCA offered no support for" its conclusion that Thacker's assertion that Judge Goodpaster refused to consider the bipolar disorder as a mitigating factor was based on a "strained reading" of Judge Goodpaster's affidavit. In short, Thacker argues that the OCCA's decision "was contrary . . . to the treatment in Eddings of strikingly similar language uttered by the OCCA itself in that case," "as well to the principles of Eddings," because Judge Goodpaster "did not consider [the bipolar disorder evidence] fully or afford it meaningful mitigating effect." Id. at 29-30.

The initial, and ultimately fatal, problem for Thacker is that he cannot rebut the factual findings made by the OCCA in resolving his claim. Factual findings made by the OCCA "are presumed correct unless rebutted by clear and convincing evidence." Wilson v. Sirmons, 536 F.3d 1064, 1070-71 (10th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)); see also Smith v. Mullin, 379 F.3d 919, 925 (10th Cir. 2004) ("As to factual findings underlying claims which the OCCA decided on the merits and for which the federal district court refused to grant an evidentiary hearing, the dictates of 28 U.S.C. § 2254(e)(1) apply and we must presume them true unless rebutted by [the petitioner] by clear and convincing evidence."). The OCCA found, as an initial matter, that the statements contained in Judge

35

Goodpaster's affidavit were true. The OCCA in turn found, based upon its interpretation of the statements in Judge Goodpaster's affidavit, that Judge Goodpaster gave full consideration to the bipolar evidence proffered by Thacker, but concluded it was insufficiently compelling to justify a sentence less than death. Although Thacker argued that Judge Goodpaster's statements indicated that he considered the bipolar evidence relevant only to the issues of sanity and competency, the OCCA characterized that as a "strained" reading of Judge Goodpaster's statements.

We conclude, having conducted our own review of Judge Goodpaster's affidavit, that the OCCA's findings regarding the intent and meaning of Judge Goodpaster's statements were entirely reasonable. And, given the OCCA's unrebutted findings, we in turn conclude that the OCCA's resolution of Thacker's claim was neither contrary to, nor an unreasonable application of, Eddings.

Although the affidavits submitted by the parties appear at first blush to be diametrically opposed, they are not. The affidavit from Thacker's post-conviction counsel asserts that Judge Goodpaster told her he discounts bipolar disorder as an excuse for the commission of a crime. Fair enough. But Thacker's argument here (as it was before the OCCA) is that Judge Goodpaster did not consider the possibly mitigating effect of his bipolar disorder, and he relies on counsel's affidavit for support. Judge Goodpaster, however, unequivocally stated in his

36

affidavit that he did consider the disorder. His statement stands unrefuted.[7] And, in fact, it is entirely consistent with what he said at sentencing:

> Every witness called by the defense in mitigation was given full and complete consideration with a high degree of scrutiny and has been weighed by the court by weighing the aggravating circumstances against the mitigating circumstances. Those mitigating circumstances include but are not limited to the love of his mother, aunt, sister, friend and former girlfriend. The reporting of the missing can of mace, the belief of the minister that Mr. Thacker has accepted some religion in his life and the doctor's report indicating some level of bipolar illness, and further that Mr. Thacker has shown remorse for his actions.

Tr. of Non-Jury Sentencing Trial, Vol. II, at 396. Thus, Thacker's argument attempting to equate an excuse for the commission of crime with mitigation fails.

As a final matter, Thacker contends, as he did with the first part of Proposition One, that the federal district court should have "conduct[ed] an evidentiary hearing at which [he] would have [had] the opportunity to refresh Judge Goodpaster's recollection and support his claim." Aplt. Br. at 20. But because Thacker has failed to sufficiently challenge the OCCA's factual findings, there was no basis for the district court to conduct an evidentiary hearing. See Schriro, 550 U.S. at 474.

*Proposition Two: Ineffective assistance of trial counsel - guilty plea*

In Proposition Two of his appellate brief, Thacker contends that his trial

---

[7] There is no possibility of further explanation. Judge Goodpaster has passed away.

counsel was ineffective in advising him to enter a blind guilty plea and in failing to file a motion to withdraw the guilty plea. According to Thacker, "[m]aterial misrepresentations and critical omissions by [his] trial counsel during their attempts to persuade him to enter a blind plea resulted in an unknowing and involuntary plea, and their failure to file the proper and necessary paperwork denied him his right to appeal." Aplt. Br. at 33.

*a) Failure to exhaust/anticipatory procedural bar*

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." Id. This rule stems from 28 U.S.C. § 2254(c), which "provides that a habeas petitioner 'shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented.'" Id. at 844 (quoting § 2254(c)). "Although this language could be read to effectively foreclose habeas review by requiring a state prisoner to invoke any possible avenue of state court review, [the Supreme Court] ha[s] never interpreted the exhaustion requirement in such a restrictive fashion." Id. (emphasis in original). Rather, the Supreme Court has held that the doctrine requires "state prisoners [to] give the state courts one full opportunity to resolve any constitutional issues by

38

invoking one complete round of the State's established appellate review process." Id. at 845. Consequently, "[t]he exhaustion doctrine . . . turns on an inquiry into what procedures are 'available' under state law." Id. at 847.

Three distinct types of direct appellate review are available to an Oklahoma capital defendant who enters a plea of guilty. First, like all criminal defendants in Oklahoma, a capital defendant who enters a plea of guilty may "appeal to the [OCCA] . . . from any judgment against him." Okla. Stat. tit. 22, § 1051(a). Such an appeal, however, appears to be limited to matters other than the conviction itself. Second, an Oklahoma capital defendant who enters a plea of guilty may challenge his conviction by way of a certiorari appeal. A certiorari appeal requires the defendant to file with the state trial court "'an application to withdraw the plea within ten (10) days from the date of the pronouncement of the Judgment and Sentence.'" Id. (quoting Rule 4.2(A), Rules of the Oklahoma Court of Criminal Appeals, Okla. Stat. tit. 22, Ch. 18, App. (2002)). "On certiorari review of a guilty plea," the OCCA's "review is limited to two inquiries: (1) whether the guilty plea was made knowingly and voluntarily; and (2) whether the district court accepting the guilty plea had jurisdiction to accept the plea." Cox v. State, 152 P.3d 244, 247 (Okla. Crim. App. 2006). Lastly, an Oklahoma capital defendant who enters a plea of guilty and is sentenced to death is entitled to mandatory sentence review by the OCCA. Mandatory sentence review requires the OCCA to determine (1) "[w]hether the sentence of death was imposed under

39

the influence of passion, prejudice, or any other arbitrary factor," and (2) "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." Okla. Stat. tit. 21, § 701.13(C).

In the instant case, Thacker did not file a motion to withdraw his guilty plea, and thus did not seek or receive certiorari review. Thacker did, however, file a direct appeal asserting two challenges to his death sentence (i.e., that the state trial court never acquired jurisdiction over the aggravating circumstances alleged by the State, and that the heinous, atrocious, or cruel aggravating circumstance was unconstitutional). The OCCA also, in disposing of Thacker's direct appeal, conducted a mandatory sentence review. Thacker I, 100 P.3d at 1058-60.

In addition to direct appellate review, Oklahoma law affords capital defendants the right to seek post-conviction relief. Specifically, a capital defendant may, subject to strict time limitations, file with the OCCA an application for post-conviction relief. Okla. Stat. tit. 22, § 1089(A), (D). "The only issues that may be raised" by a capital defendant "in an application for post-conviction relief are those that . . . [1] [w]ere not and could not have been raised in a direct appeal[,] and . . . [2] [s]upport a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." Id. § 1089(C).

It is undisputed that Thacker filed three applications for post-conviction

relief with the OCCA.  The first was filed in February 2005 and asserted three issues, including claims of ineffective assistance of trial counsel and appellate counsel.  The second was filed in September 2006, after Thacker had initiated these federal habeas proceedings.  And the third application was filed in December 2006, prior to the resolution of Thacker's second application.  In none of these applications for post-conviction relief did Thacker assert the ineffective assistance of trial counsel claim he now seeks to assert in these federal habeas proceedings, i.e., that trial counsel was ineffective in advising him to enter a blind guilty plea and in subsequently failing to file a motion to withdraw the plea.

The question that we must resolve, consequently, is whether Thacker failed to exhaust his state court remedies with respect to this claim and is now procedurally barred from raising the claim in state court.  Thacker contends that "he desired a certiorari appeal, however that appeal was denied to him because trial/appellate counsel failed to file the required motion to withdraw a plea." Aplt. Br. at 36.  "As a result," he argues, he "could not raise the issues here," and "[b]y law . . . only received mandatory sentencing review." Id.  Thacker further argues that "[s]tate post-conviction [review] was . . . not available to raise these claims." Id.

The factual basis of Thacker's arguments is only partially correct.  He is correct in asserting that he could not have raised in his direct appeal, or the

41

accompanying mandatory sentence review,[8] the ineffective assistance of trial

counsel claim he now seeks to assert in these federal habeas proceedings (i.e.,

that his trial counsel was ineffective in advising him to plead guilty and in

subsequently failing to file a motion to withdraw the plea). More specifically,

because Thacker was represented on appeal by OIDS attorney Gretchen Mosley,

one of his trial attorneys, and because his ineffective assistance of trial counsel

claim was based upon evidence outside of the record on appeal, he could not have

been reasonably expected to assert the ineffective assistance claim on direct

appeal. See generally Turrentine v. Mullin, 390 F.3d 1181, 1206 (10th Cir.

2004).

But Thacker clearly could have asserted the ineffective assistance claim in

his first application for state post-conviction relief. See Davis v. State, 123 P.3d

243, 246 (Okla. Crim. App. 2005) (holding "that the importance of the Sixth

Amendment compels us to consider all claims of ineffective assistance of trial

counsel raised in a timely application for post-conviction relief").[9] Indeed, as

_____

[8] Although Thacker asserts that he "only received mandatory sentencing
review" following his conviction and sentence, Aplt. Br. at 36, the record
indicates that Thacker filed a direct appeal asserting two challenges to his death
sentence. The OCCA rejected both of those issues, and in turn conducted the
mandatory sentencing review.

[9] Prior to 2004, the OCCA "followed a minority position requiring a
criminal defendant to raise ineffective assistance of trial counsel claims on direct
appeal or forfeit them." Davis, 123 P.3d at 245. In 2004, however, the Oklahoma
Legislature "amended the Capital Post-Conviction Procedure Act" in order to

(continued...)

42

noted above, Thacker asserted claims of ineffective assistance of trial and appellate counsel in his first application for post-conviction relief, and obviously could have included the current ineffective assistance claim had he chosen to do so.

Although Thacker contends generally in this appeal that Oklahoma law prevented him from doing so, he fails to offer any specific arguments to support this contention. The only conceivable argument he could offer in this regard would appear to be based on the language of Okla. Stat. tit. 22 § 1089(C), which, as previously noted, limits the claims reviewable on post-conviction to those that "[w]ere not and could not have been raised in a direct appeal" and "[s]upport a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." Because the ineffective assistance claim Thacker now seeks to assert could not have been raised in a direct appeal, the only way it would have been precluded in an application for post-conviction relief would have been if it did not "support a conclusion . . . that the outcome of the trial would have been different but for the error[]" (since there is no assertion or evidence that Thacker is factually innocent). Although it is unclear precisely how the OCCA would interpret this requirement, the Supreme

---

[9](...continued)
change Oklahoma's procedural requirements. Id. In 2005, the OCCA expressly acknowledged this change in Oklahoma law. Id.

43

Court has held, in the context of a claim that trial counsel was ineffective in advising a defendant to plead guilty, that prejudice from such ineffective assistance is established by showing a reasonable probability that, but for counsel's deficient performance, the defendant would not have pled guilty and would have proceeded to trial. Hill v. Lockhart, 474 U.S. 52, 60 (1985). Thacker's ineffective assistance claim is based on this very notion, i.e., that if his trial counsel had properly advised him, he would not have entered a blind guilty plea and would instead have exercised his right to a jury trial. Thus, Thacker's ineffective assistance claim fits within the parameters of claims allowed to be asserted in applications for post-conviction relief.

Were Thacker to now return to state court to attempt to exhaust a claim that trial counsel was ineffective in advising him to enter a blind plea and in failing to file a motion to withdraw the guilty plea, by filing a fourth application for post-conviction relief, it would be procedurally barred under Oklahoma law because Thacker failed to assert it in any of his applications for post-conviction relief. See Okla. Stat. tit. 22, § 1086 ("All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application."); Okla. Stat. tit. 22, § 1089(D)(2) ("All grounds for relief that were available to the applicant before the last date on which an application could be timely filed not included in a timely application shall be deemed waived."). Thacker must therefore overcome an "anticipatory procedural bar" to proceed on

44

his ineffective assistance claim. Anderson v. Sirmons, 476 F.3d 1131, 1140 n.7 (10th Cir. 2007) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if petitioners returned to state court to exhaust it.").

The only way for Thacker to circumvent this anticipatory procedural bar is by making either of two alternate showings: he may demonstrate "cause and prejudice" for his failure to raise the claim in his initial application for post-conviction relief, or he may show that failure to review his claim will result in a "fundamental miscarriage of justice." Id. at 1140. The latter option is clearly foreclosed, since it hinges on a persuasive showing that Thacker is actually innocent. Notably, Thacker does not assert he is actually innocent, nor could he credibly do so in light of the significant amount of evidence pointing to his guilt, including his repeated admissions under oath to having kidnapped, raped, and murdered Hill. Thus, he is left to rely on the "cause and prejudice" exception.

In a letter filed with this court pursuant to Federal Rule of Appellate Procedure 28(j), Thacker now asserts for the first time that the attorney who represented him in his first application for post-conviction relief was ineffective for failing to argue in that application that Thacker's trial counsel was ineffective for advising him to plead guilty and for subsequently failing to file a motion to withdraw the plea. In support of this new assertion, Thacker relies on the Supreme Court's recent decision in Martinez v. Ryan, — S. Ct. —, 2012 WL

45

912950 (Mar. 20, 2012) (holding that where, under state law, ineffective-assistance-of-trial-counsel claims must be raised in initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing those claims if, in the initial-review proceeding, there was no counsel or counsel in that proceeding was ineffective).

It is well established that we will not consider issues raised for the first time in a Rule 28(j) letter. E.g., United States v. Quaintance, 608 F.3d 717, 720 n.2 (10th Cir. 2010); United States v. Kimler, 335 F.3d 1132, 1138 n.6 (10th Cir. 2003). That is because, in part, the language of Rule 28(j) "underscores that an appellant's supplemental authority must relate to an issue previously raised in a proper fashion, and that an appellant cannot raise a wholly new issue in a supplemental authority letter or brief." United States v. Levy, 379 F.3d 1241, 1244 (11th Cir. 2004). Although it may be true that Thacker could not have, at the time he initiated these federal habeas proceedings, predicted the Supreme Court's resolution of the Martinez case, he most certainly could have argued in his federal habeas petition, as the petitioner in Martinez did, that ineffective assistance of post-conviction counsel was the "cause" for his failure to raise his ineffective assistance of trial counsel claim. He has never raised this issue until he filed his Rule 28(j) letter.

Thus, in sum, we conclude that Thacker's claim of ineffective assistance of trial counsel is procedurally barred.

46

*b) The merits of Thacker's claim*

Even if we could overlook the procedural bar, Thacker would not be entitled to federal habeas relief on the basis of his ineffective assistance of trial counsel claim. Thacker contends that his "[t]rial counsel knew: (1) [he] suffered from a severe mental illness, which caused him to act impulsively to the point where he could not consider the consequences of his actions; and (2) [his] ex-wife filed a civil complaint in Mayes County wherein she alleged [he] sexually abused her daughter." Aplt. Br. at 38. "Despite this knowledge," Thacker argues, his "trial counsel approached [him] . . . a week before his trial was to begin and convinced him to enter into a blind plea and to request sentencing by the trial judge, who had a fifty percent chance of having highly prejudicial and inflammatory information — allegations that . . . Thacker sexually abused his stepdaughter." Id. Thacker argues that his "[c]ounsel continued to fail [him] when counsel failed to follow his . . . explicit request to obtain a certiorari appeal of his conviction and sentence." Id. at 38-39.

As Thacker correctly notes, his claim is governed by the standards outlined in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." 466 U.S. at 687. "First," the Court noted, "the defendant must show that counsel's performance was deficient." Id. "This requires showing that

47

counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." Id. "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

Just last year, the Supreme Court discussed the application of the Strickland standards to cases in which the defendant asserts his trial counsel was ineffective at the plea bargain stage. In doing so, the Supreme Court began by noting that "[s]urmounting Strickland's high bar is never an easy task," Premo v. Moore, 131 S. Ct. 733, 739 (2011) (internal quotation marks omitted), and it emphasized that "[e]ven under de novo review, the standard for judging counsel's representation is a most deferential one," id. at 740. In other words, the Supreme Court noted, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Id. (quoting Strickland, 466 U.S. at 690). Continuing, the Supreme Court cautioned reviewing courts against too readily concluding that counsel was ineffective in advising a defendant to plead guilty:

> Acknowledging guilt and accepting responsibility by an early plea respond to certain basic premises in the law and its function. Those principles are eroded if a guilty plea is too easily set aside

based on facts and circumstances not apparent to a competent attorney when actions and advice leading to the plea took place. Plea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks. * * *

These considerations make strict adherence to the Strickland standard all the more essential when reviewing the choices an attorney made at the plea bargain stage. Failure to respect the latitude Strickland requires can create at least two problems in the plea context. First, the potential for the distortions and imbalance that can inhere in a hindsight perspective may become all too real. The art of negotiation is at least as nuanced as the art of trial advocacy and it presents questions farther removed from immediate judicial supervision. There are, moreover, special difficulties in evaluating the basis for counsel's judgment: An attorney often has insights borne of past dealings with the same prosecutor or court, and the record at the pretrial stage is never as full as it is after a trial. In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel. Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). AEDPA compounds the imperative of judicial caution.

Second, ineffective-assistance claims that lack necessary foundation may bring instability to the very process the inquiry seeks to protect. Strickland allows a defendant "to escape rules of waiver and forfeiture," Richter, — U.S., at —, 131 S.Ct. 770. Prosecutors must have assurance that a plea will not be undone years later because of infidelity to the requirements of AEDPA and the teachings of Strickland. The prospect that a plea deal will afterwards be unraveled when a court second-guesses counsel's decisions while failing to accord the latitude Strickland mandates or disregarding the structure dictated by AEDPA could lead prosecutors to forgo plea bargains that would benefit defendants, a result favorable to no one.

Whether before, during, or after trial, when the Sixth Amendment applies, the formulation of the standard is the same: reasonable competence in representing the accused. Strickland, 466 U.S., at 688, 104 S.Ct. 2052. In applying and defining this standard

49

substantial deference must be accorded to counsel's judgment. Id., at 689, 104 S.Ct. 2052. But at different stages of the case that deference may be measured in different ways.

In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. The absence of a developed or an extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered.

Id. at 741-42.

Applying these principles to the facts presented in this case, it is quite clear that Thacker cannot establish that his trial attorneys were incompetent in advising him to enter a blind guilty plea. The in camera proceeding held before the state trial court on December 2, 2002, just prior to Thacker formally entering his guilty plea, is particularly telling on this issue. During that proceeding, Thacker's lead counsel, Silas Lyman, questioned Thacker regarding his decision to enter a blind guilty plea. In doing so, Lyman, and in turn Thacker, noted that they had discussed "defenses [Thacker] might have and mitigation or evidence available to [him]," Tr. of In Camera Proceeding on 12/2/02, at 4, and in particular had "talked about a theory where [they] would contest every legal issue in the case," as well as asserting "possible defenses that Oklahoma doesn't necessarily recognize but that [they] would try to pursue on [his] behalf such as emotional

50

disturbance or diminished capacity or something of that nature at the time that the[] offenses occurred," id. at 5. In turn, Lyman and Thacker noted they had retained the services of a psychiatrist, Dr. Keith Caruso, who opined that "the defense of insanity or any other possible available defenses d[id]n't exist for [Thacker] as far as [his] mental state of mind at the time the[] offenses occurred." Id. at 6. Lyman and Thacker also noted that Thacker had "made numerous statements," id., to authorities, that "there [wa]s DNA evidence . . . connecting [him] to not only the victim but also weapon that was involved in killing her," id. at 6-7, and that "the weight of the state's case [against him] [wa]s great," id. at 7. In short, Lyman and Thacker agreed there were no "viable defenses" to the charged crimes, id., and both "believe[d] that [Thacker] would be found guilty by a jury or a court in the first stage," id. at 8. Lyman and Thacker then noted that, for "[a]t least a week" prior to the in camera hearing, they had "talked about another strategy and that was where [they] would concede [his] guilt," and then have either the jury or the trial judge determine the sentence. Id. And Thacker testified that he believed "the best" option was to enter a plea of guilty and have the trial judge sentence him. Id. at 9. In reaching this conclusion, Lyman and Thacker discussed what they perceived as the difficulty of receiving a fair trial from a jury in Mayes County, presumably given the amount of pretrial publicity regarding the charged crimes, id. at 10, as well as the likelihood of the crime scene photographs "inflam[ing] the passions of the jury," id. at 11.

51

Ultimately, Lyman and Thacker engaged in the following colloquy that highlighted their strategic discussions and final decision:

Q.    It really comes down to this, Steven, we have, we being the defense team, have viewed your case and considered all of the options. We've, we in the form of trial strategy I think believed early on that it wouldn't make much sense to try a case aggressively in the first stage of the trial to a jury because of the likelihood that you would be found guilty and the need, if you will, to save face with the jurors that may eventually be sentencing. We've also considered the theory of conceding guilt, letting the jury know right away that you're responsible for these offenses and trying the case in terms of sentencing and trying to get a sentence of less than death, we've considered that theory and that would be similar to Jackson v. State where a concession occurred during the first stage of trial with the request to have a jury in effect decide the punishment. Have we talked about that?

A.    Yes.

Q.    And we've also talked in terms of having you plead guilty and having this court even though there's no agreement, no arrangement made, pleading blind to this judge and having him sentence you, have we not?

A.    Yes.

Q.    The team believes that the last one of those three scenarios in light of the court's previous rulings such as on change of venue and our Ring[ v. Arizona] motions and other motions that that is in your best, best favor to do that and have the judge try this case as far as sentencing.

A.    Yes.

Q.    That is our recommendation.

A.    Yes.

Q.    It also happens to be what you want, isn't it?

52

A. Yes.

Q. Did anybody force you from the defense team to go in that direction and make you do that theory?

A. No.

Q. We've talked in terms of the case and the facts and the defenses and we've deliberated this in effect with ourselves, haven't we?

A. Yes.

* * *

Q. Now one of the concerns I have is because I've known you for three years and I've seen your emotions change at times over the period of time, sometimes you seem a little more depressed than others but you've always seemed to understand me and I've never really had a problem understanding you but knowing your mental health history do you think that's affecting your decision today?

A. No.

Q. Now, I don't think it's any secret but you've previously been tried in Tennessee and you were found guilty and a jury gave you the death penalty in Tennessee.

A. Yes.

Q. Does the fact that you've previously received the death penalty, is that affecting you in any way of you making this decision today?

A. No.

Q. This was your opinion yesterday, wasn't it?

A. Yes.

Q. And it was your opinion last week when we met and talked to you about it?

53

A.    Yes.

Q.    How did you feel when you first learned that we were contemplating this approach?

A.    I thought it might be a, I thought it was a good idea.

Q.    You've mentioned in your addendum that if you plead guilty one of the reasons why you're pleading guilty is because you are guilty.

A.    Yes.

Q.    How about the family, how do you feel about the family in this situation?

A.    Well I'm sorry that I caused them pain and I just, I don't want to put them through a long drawn out trial and make them have to relive everything.

Q.    Is that feeling affecting your decision in part of why you're pleading guilty?

A.    Yes.

Q.    Is it affecting it to the point that you don't understand?

A.    No.

Id. at 20-23.

This evidence clearly establishes, contrary to Thacker's current allegations, that his trial counsel considered all of the available strategic options for defending Thacker and concluded, in the end, that the best strategy was to have Thacker enter a blind guilty plea and be sentenced by the state trial judge rather than the jury. Although Thacker is now critical of this advice, he fails to identify

54

precisely what strategy he believes would have been better. And, most importantly for purposes of his Strickland claim, he fails to establish that his trial counsel, in advising him to plead guilty, "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." Strickland, 466 U.S. at 687. Indeed, a review of the record establishes precisely the opposite.

This same evidence also undercuts Thacker's claim that his trial counsel was ineffective for failing to file a motion to withdraw his guilty plea. More specifically, there was no legitimate factual or legal basis for seeking to withdraw the plea. And, although Thacker now contends that he "always wanted to appeal both his judgment and sentence," Aplt. Br. at 53, nothing in the state court records support this contention.

Thus, in sum, Thacker cannot prevail on the merits of his ineffective-assistance-of-trial-counsel claim.

*Proposition Three: equal protection/due process violation*

In Proposition Three of his appellate brief, Thacker contends that he "was denied Equal Protection and Due Process of law because the Oklahoma courts failed to follow established procedures to determine whether he desired an appeal." Aplt. Br. at 58. In support, Thacker contends that "his [trial] counsel's failure to file the proper paperwork to initiate [a certiorari] appeal[, i.e., a motion to withdraw his guilty plea,] had the legal effect of placing him in the same

55

category as [capital defendant] volunteers who have expressly waived their appeal rights." ROA, Vol. 1 at 60 (petition for writ of habeas corpus). Thacker further contends that, although "Oklahoma has an established procedure it applies to such persons before permitting them to waive their appeals," including a requisite mental-health evaluation and a hearing before the state trial court to determine whether the defendant is competent to waive his capital direct appeal, "[t]hat procedure was not followed in [his] case." Id. "As a result," Thacker contends, he "had no opportunity to present winning claims in state court [but he does not identify precisely what those "winning claims" might be]." Id.

*a) Failure to exhaust/anticipatory procedural bar*

As we have already discussed, Thacker did not file a motion to withdraw his guilty plea, and thus did not seek or receive certiorari review from the OCCA. He did, however, file a direct appeal asserting two challenges to his death sentence. The OCCA rejected both of those challenges and, in disposing of Thacker's direct appeal, conducted mandatory sentence review. Thacker I, 100 P.3d at 1058-60. Thacker subsequently filed three applications for post-conviction relief with the OCCA. It is undisputed, however, that in none of those applications did Thacker assert the equal protection and due process arguments he now seeks to assert in Proposition Three of this appeal.

Thus, we must decide whether Thacker failed to exhaust his state court remedies with respect to this claim, and if so, whether he is now subject to an

56

anticipatory procedural bar. On these points, Thacker incorporates by reference the arguments he made in Proposition Two regarding exhaustion and procedural bar. Aplt. Br. at 58 ("This proposition of error is in the same procedural posture as Proposition Two."). Presumably, Thacker's position is that he could not have raised this issue either in his direct appeal or in his applications for post-conviction relief.

Thacker fails, however, to explain why he could not have raised the issue in the direct appeal he filed with the OCCA. Perhaps Thacker could argue that he failed to do so because the claim hinges, in part, on his assertion that his trial counsel failed to file a motion to withdraw his guilty plea, and in turn because he was represented on direct appeal by one of his trial attorneys. Assuming these facts reasonably prevented Thacker from asserting the claim on direct appeal, he could have, at a minimum, asserted the claim in one of his applications for post-conviction relief. Although it is apparently Thacker's position that this avenue of relief was not available either, he fails to offer any specific arguments to support this assertion.

And, as with the claim asserted in Proposition Two, were Thacker to return to state court to attempt to exhaust this claim by filing a fourth application for post-conviction relief, it would be procedurally barred under Oklahoma law because of Thacker's failure to assert it in either on direct appeal or in his initial application for post-conviction relief. Thus, as with the claim asserted in

57

Proposition Two, Thacker must therefore overcome an "anticipatory procedural bar" to proceed on this due process/equal protection claim. Anderson, 476 F.3d at 1140 n.7.

As we concluded with respect to the claim asserted in Proposition Two, Thacker cannot overcome the anticipatory procedural bar applicable to his due process/equal protection claim. To begin with, there is no assertion or evidence that Thacker is actually innocent, and thus he cannot show that failure to review his claim would result in a "fundamental miscarriage of justice." Id. at 1140. Further, although Thacker has filed a Rule 28(j) letter asserting for the first time that his post-conviction counsel was ineffective for failing to raise the claim, we do not, as we have already stated, consider arguments raised for the first time in a Rule 28(j) letter.

*b) The merits of Thacker's claim*

As with Proposition Two, even if we were to overlook the procedural bar applicable to Proposition Three, there is simply no merit to the claim. Thacker bases his claim, in pertinent part, on a trio of OCCA decisions that addressed the steps that state trial courts must take in the event that a capital defendant effectively "volunteers" to be put to death by waiving the presentation of all mitigating evidence and foregoing a direct appeal of his death sentence (in one of the three cases, Grasso, the defendant also requested that the trial court impose the death penalty). Hooper v. State, 142 P.3d 463 (Okla. Crim. App. 2006); Fluke

58

v. State, 14 P.3d 565 (Okla. Crim. App. 2000); Grasso v. State, 857 P.2d 802

(Okla. Crim. App. 1993). In such a situation, the OCCA held, the state trial court

must strictly follow a series of procedural steps:

> Before permitting a waiver of the rights to jury trial and to present mitigating evidence, the trial court must order an independent competency evaluation. After making the determination that a defendant is competent to waive a jury trial, a trial court must follow several steps to ensure a defendant is knowingly and intelligently waiving the presentation of mitigating evidence.
>
> (1) The court must inform the defendant of the right to present mitigating evidence, and what mitigating evidence is.
>
> (2) The court must inquire both of the defendant and his attorney (if not pro se) whether he or she understands these rights.
>
> (3) The court should also inquire of the attorney if he or she has attempted to determine from the defendant whether there exists any evidence which could be used to mitigate the aggravating circumstances proven beyond a reasonable doubt by the prosecution.
>
> (4) If such information has been given, the attorney must advise the court what that mitigating evidence is; if the defendant has refused to cooperate, the attorney must relate that to the court.
>
> (5) The trial court must inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence.
>
> (6) After being assured the defendant understands these concepts, the court must inquire of the defendant whether he or

she desires to waive the right to present such mitigating evidence.

(7) Finally, the court should make findings of fact pursuant to Grasso of the defendant's understanding and waiver of rights.

Hooper, 142 P.3d at 466 (internal footnotes omitted).

Thacker argues that he is similarly situated to the death penalty "volunteers" in Hooper, Fluke, and Grasso because his counsel's failure to file a motion to withdraw his guilty plea resulted in a waiver of his right to file a certiorari appeal challenging his conviction. In turn, Thacker argues that he "was never afforded nor was he offered" the procedural protections mandated by Hooper. Aplt. Br. at 59.

We reject Thacker's arguments. At bottom, Thacker is not "similarly situated" to the death penalty "volunteers" in Hooper, Fluke, and Grasso. Although he pled guilty to the charges against him and waived his right to sentencing before a jury, he retained and exercised his right to present mitigating evidence to the state trial judge and he asked the state trial judge to impose a sentence less than death. And after he was sentenced to death, Thacker retained and exercised his right to challenge the death sentence imposed by the state trial judge. Thus, in no way did Thacker "volunteer" to be executed. Consequently, the procedural protections outlined in Hooper were not applicable to him.

It is also worth noting that, in any event, the state trial judge was careful in determining that Thacker acted knowingly and voluntarily in (a) entering a plea of

60

guilty to the charges against him, and (b) waiving his right to be sentenced by a jury. In particular, the state trial judge took into account the views of all three of Thacker's trial attorneys,[10] all of whom opined that Thacker was competent. The district court also directly questioned Thacker, both during the in camera hearing and during the in-court plea hearing. Lastly, the district court was aware of the opinions of Dr. Keith Caruso, a psychiatrist retained by the defense team (and subsequently heard Caruso testify at the non-jury sentencing proceeding). Caruso opined that although Thacker suffered from bipolar disorder, he was sane at the time he committed the crimes and was competent to stand trial. Tr. of Non-Jury Sentencing Trial, Vol. I, at 187-88. Together, these facts establish that the state trial court concluded that Thacker was competent to waive his right to a first-stage jury trial.

*Proposition Four: cumulative error*

---

[10] For example, Thacker's lead counsel, Silas Lyman, stated that "at no time" during his two-and-a-half years of representing Thacker "did [he] feel like [Thacker] didn't understand what we were needing or talking about or whatever the subject matter was he was long with us on that." Tr. of In Camera Hearing on 12/2/02, at 33. Co-counsel Lynn Burch similarly stated: "Steven understands the process that's going on, he's asked relevant questions that pertain to the strategies and at all times has been able to work with his attorneys and help us reach good determination of this case." Id. Lastly, co-counsel Gretchen Mosley testified, "I've never had a doubt as to his competency for sure and in addition to that he has come up with ideas and arguments that we hadn't even thought of that were relevant and persuasive and that we've also incorporated into our trial strategy and ideas when looking at this case. He definitely seems to understand what's happening." Id. at 34.

In his fourth and final proposition of error, Thacker alleges cumulative error. As the term "cumulative" suggests, "[c]umulative-error analysis [in the federal habeas context] applies [only] where there are two or more actual [constitutional] errors." Castro v. Ward, 138 F.3d 810, 832 (10th Cir. 1998). "It does not apply . . . to the cumulative effect of non-errors." Id. Because we have found the existence of no constitutional errors, we must "refrain from engaging in a cumulative error analysis." United States v. Franklin-El, 555 F.3d 1115, 1128 (10th Cir. 2009).

IV

The judgment of the district court is AFFIRMED.