**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 5, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANTHONY ROZELLE BANKS,

               Petitioner - Appellant,

v.

RANDALL WORKMAN, Warden,
Oklahoma State Penitentiary,

               Respondent - Appellee.

No. 10-5125

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:03-cv-00198-CVE-TLW)**

---

Thomas D. Hird, Assistant Federal Public Defender, Oklahoma City, Oklahoma
(Randy A. Bauman, Assistant Federal Public Defender, with him on the briefs) for
Petitioner-Appellant Anthony Banks.

Jennifer B. Miller, Assistant Attorney General for the State of Oklahoma,
Oklahoma City, Oklahoma (E. Scott Pruitt, Attorney General for the State of
Oklahoma, with her on the briefs) for Respondent-Appellee Randall Workman.

---

Before **MURPHY, O'BRIEN,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

After Sun Travis was abducted, raped, and shot dead, an Oklahoma jury

found Anthony Banks, by that time already in prison for another killing, guilty of

murdering Mrs. Travis and sentenced him to death. After an unsuccessful direct appeal and two rounds of collateral review in state court, Mr. Banks filed a federal habeas petition. The district court denied his petition but granted him a certificate of appealability to pursue several arguments before this court. After careful review and in accord with the decisions of all the courts that have preceded us, we hold none merits relief.

I

A

Mrs. Travis, a Korean national, met her future husband when he was serving in the American military on deployment in Korea. The two married and moved to Tulsa, where it appears they lived happily. That is, until one day in 1979 when Mrs. Travis was kidnaped on her way back from work. The next time Mr. Travis saw his wife, she was dead.

At first, the police knew very little. Mrs. Travis's husband was at home preparing dinner when he looked out the window and saw his wife's car pull into the apartment complex's parking lot, apparently followed by another vehicle. After several minutes passed and she didn't come inside, he went out to check on her. She was nowhere to be seen. Mr. Travis sensed something was amiss because the car was parked at an odd angle with the headlights still on and the driver's door open. The pillow that Mrs. Travis kept on the driver's seat was lying in the street.

The next morning, a fuller picture emerged. A man on a tractor discovered Mrs. Travis's body in a roadside ditch. She had suffered a gunshot wound to the head, and her face bore recent bruises. Her blouse was missing and her panties were ripped and lying by her feet. The medical examiner found semen on her clothing, in her vagina, and in her anus. Still, the police had no leads for months.

But finally Anthony Banks approached investigators with information, hoping he could use it to secure lenient treatment for unrelated robbery charges. On his account, he was present during the crime but his friend, Allen Nelson, was responsible. Mr. Banks claimed he was giving Mr. Nelson a ride across town when Mr. Nelson asked him to pull over at what turned out to be Mrs. Travis's apartment complex. According to Mr. Banks, Mr. Nelson left the car and spoke for a few minutes with Mrs. Travis. The pair then returned to the car together and Mr. Nelson asked Mr. Banks to drive to a nearby apartment complex. Once there, Mr. Banks stayed in the car drinking beer while the other two went inside. Eventually, they got back on the road and drove until Mr. Nelson told Mr. Banks to pull over. It was then, according to Mr. Banks, Mr. Nelson took his victim out of the car and shot her in the head. As they were driving away, Mr. Nelson noticed Mrs. Travis's blouse and purse lying in the back seat and asked Mr. Banks to pull over again so that he could discard them in a nearby storm drain. Mr. Banks disavowed any participation in the killing and claimed he was simply along for the ride.

Despite Mr. Banks's statement, the local authorities felt they didn't have enough evidence to charge either Mr. Banks or Mr. Nelson with the crime. And so the case went cold.

B

Nearly two decades passed before a police investigator decided in 1997 to take a fresh look at the case with the help of DNA testing. DNA testing by two different analysts revealed that the seminal fluid in Mrs. Travis's crotch area matched Mr. Banks's DNA, the fluid found in the rectal area matched Mr. Nelson, and the semen on her pants was a mixture of the two men's DNA. One of the analysts said the likelihood of a random African American individual matching the DNA sequence attributed to Mr. Banks was on the order of 1 in 300 billion.

Armed with this evidence, the State of Oklahoma brought murder charges against Mr. Banks and Mr. Nelson. Because each defendant had made incriminating statements about the other, the court granted a motion to sever. At Mr. Banks's trial and in a single disjunctive charge, the government alleged that he committed first degree murder with malice aforethought and first degree felony murder in the course of rape and kidnaping. At trial, the prosecution introduced all the evidence sketched out above and the jury found Mr. Banks guilty of first degree murder, though its verdict didn't specify whether it found him guilty of murder with malice aforethought or felony murder — or perhaps both.

At the sentencing phase, the government argued death was an appropriate penalty because of the presence of four aggravating factors: (1) Mr. Banks posed a continuing threat to society; (2) the murder was especially heinous, atrocious or cruel; (3) the murder had been committed to avoid lawful arrest or prosecution; and (4) Mr. Banks had prior violent felony convictions. With respect to the first two aggravators, the government rested primarily on the evidence presented during the guilt phase. For the final, prior violent felony aggravating factor, the prosecution showed that Mr. Banks had been convicted of no fewer than eight prior violent felonies: several armed robberies, burglaries, an attempted prison escape, assault and battery, and another murder.[1] And to support its claim Mr. Banks murdered Mrs. Travis to avoid being identified and arrested for the rape, the government introduced evidence that Mr. Banks's previous murder victim, too, had been shot in the head after witnessing Mr. Banks commit a crime (there, the robbery of a convenience store). Mr. Banks's ex-wife testified that Mr. Banks came to her the night of the first murder and told her that he had killed his victim because "dead men tell no tales," and that he "never shoot[s] below the neck."

---

[1] At the time of his trial for Mrs. Travis's murder, Mr. Banks was serving life in prison for this other murder. Originally, he had been sentenced to death for the crime, but that sentence was undone by the prosecution's failure to disclose exculpatory evidence. *See Banks v. Reynolds*, 54 F.3d 1508, 1517-18 (10th Cir. 1995). To avoid a re-trial and possible reimposition of the death penalty, Mr. Banks pleaded guilty and accepted a life sentence.

The defense's mitigation strategy at the sentencing phase was to try to show that Mr. Banks had psychological problems and a troubled childhood, but that his condition improved greatly over the many years he had (by that point) lived in prison. Mr. Banks's mother and father testified that Mr. Banks had been abused as a child and put out on the street when he was fifteen. At one point, Mr. Banks's father put a gun to his son's head and threatened to "blow [his] head off" for violating the rules at his father's night club. The defense also presented testimony by a clinical psychologist, Philip Murphy, who said that Mr. Banks suffered from severe psychopathy at the time of the murder. According to Dr. Murphy, the structured environment of prison had changed Mr. Banks so that he no longer posed a significant danger to others. Corrections officers likewise testified that Mr. Banks was a model inmate and the prison chaplain stated Mr. Banks had undergone a genuine religious conversion.

In the end and despite the defense's efforts, the jury voted unanimously to impose the death penalty. The jury found the mitigating circumstances outweighed by three of the four aggravating factors charged by the government — finding that the murder was committed to avoid a lawful arrest; that the murder was especially heinous, atrocious or cruel, and that Mr. Banks had prior violent felony convictions.

The Oklahoma Court of Criminal Appeals (OCCA) denied relief to Mr. Banks in his direct appeal and in his two subsequent state post-conviction

petitions. Mr. Banks then filed a federal habeas petition, which the district court denied in a ninety page opinion. Because the district court granted Mr. Banks's motion for a certificate of appealability on a number of issues, the case now comes to us, requiring us to assess whether the government violated his rights under the Confrontation Clause and its duty to disclose exculpatory evidence (Part II); whether the government failed to produce exculpatory evidence (Part III); whether Mr. Banks's due process right to a competent expert and his Sixth Amendment right to effective assistance of counsel were infringed (Part IV); whether various instances of alleged prosecutorial misconduct rendered his trial fundamentally unfair, in violation of the Fourteenth Amendment (Part V); and whether cumulatively any errors here warrant relief (Part VI).

## II

Mr. Banks first claims that his conviction violated his rights under the Sixth Amendment Confrontation Clause. We agree with both the OCCA and the district court that the admission of the challenged testimony was harmless, and explain our reasons first with respect to the guilt and then the sentencing phase.

## A

The Confrontation Clause challenge stems from the government's decision to call Mr. Banks's brother, Walter Banks, as a witness at trial. Apparently, Walter was at one point long ago facing (unrelated) criminal charges of his own, and hoping for favorable treatment he told police his brother had admitted to

- 7 -

shooting Sun Travis. But by the time of the Travis murder trial, nearly twenty years later, Walter wasn't talking. In a hearing outside the presence of the jury, Walter made abundantly clear that he planned to take the Fifth. The judge informed him that he had no valid Fifth Amendment privilege to claim and could be held in contempt for failing to testify. But Walter told the judge this fazed him not at all, since he too was already serving a life sentence. Even so and over Mr. Banks's objection, the judge allowed the prosecution to call Walter to the stand in front of the jury. As promised, Walter refused to answer even the most innocuous of questions, but still the government inched closer to the point, asking whether Walter ever had a conversation with police about the Travis murder. Again, no response. Finally, the government just came out with it: "Did your brother tell you that he killed Sun Travis?" Predictably, Walter remained silent.

Mr. Banks contends that this line of questioning violated his Confrontation Clause rights because it created a powerful inference that Mr. Banks was the shooter and had admitted to the killing, and did so in a form not subject to cross-examination. *See* Aplt. Br. at 13 (citing, *inter alia*, *Douglas v. State of Ala.*, 380 U.S. 415, 419-20 (1965)). The OCCA found that the prosecutor's line of questioning was constitutionally improper, a holding that Oklahoma doesn't challenge in these federal habeas proceedings. *Banks v. State*, 43 P.3d 390, 398 (Okla. Crim. App. 2002).

Instead, Oklahoma asks us to uphold the OCCA's determination that any impropriety in this line of questioning was harmless. When reviewing state court determinations that a constitutional error was harmless, we ask whether the error had a "substantial and injurious effect" on the jury's decision. *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007). This standard precludes reversal of a conviction on habeas unless we have a "grave doubt" about the effect of the error on the verdict. *Welch v. Workman*, 639 F.3d 980, 992 (10th Cir. 2011).

We cannot say that the conceded error leaves us in "grave doubt" about the outcome in this case. The evidence for the felony murder charge was overwhelming. The circumstantial evidence showed Mrs. Travis had been forcibly kidnaped and raped. The scene of the parking lot complex wasn't consistent with any theory that Mrs. Travis entered Mr. Banks's vehicle voluntarily: her car's headlights were on, the door was open, and her seat pillow was lying in the street. The physical evidence — her missing blouse, her torn panties, and the recent bruising on her face — is difficult to reconcile with a claim of consensual intercourse. And the evidence of Mr. Banks's participation in the kidnaping and rape was strong. By his own admission, Mr. Banks was present at the scene of both the abduction and the killing. The DNA evidence directly contradicted Mr. Banks's denial of participation in the rape. And, as the OCCA pointed out, after asking Walter about his admission the prosecution never returned to it and never tried to build its case out of any inference from his refusal

to testify. Given all this, we have no trouble concluding that, as to the felony murder charge, the error was harmless.

Mr. Banks insists all this is academic. Academic because we are not permitted to separate the felony charge from the malice aforethought murder allegation where, he claims, the error surely *was* harmful. All this is so, he says, because the felony murder and the malice aforethought murder charges were brought in a single disjunctive count. Relying on *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978), he claims that an error harmful with respect to one of two disjunctive charges requires the reversal of the whole conviction, at least where (as here) there is no definitive way to tell from the jury's verdict which of the two charges provided the basis for its conviction.

Whether *Yates* applies to evidentiary error (as opposed to erroneous jury instructions) is an unresolved legal question and one we need not decide today. Mr. Banks never presented a *Yates* argument to the OCCA or to the district court. In both proceedings he argued only in general terms that the inference he was the shooter prejudiced him in the minds of the jury. ROA at 60-62; OCCA Br. at 70-73. He neither cited *Yates* nor argued that harmfulness with respect to the malice aforethought charge independently required reversal. And this is doubly problematic. His failure to present the issue to the district court means we must apply the plain error standard. *Richison v. Ernest Group, Inc.*, 634 F.3d 1123,

1130-31 (10th Cir. 2011). Even more fundamentally, his failure to present a *Yates* claim either on direct appeal or his state habeas petition means the claim is procedurally defaulted. Okla. Stat. tit. 22 § 1089(D)(8). And that, of course, is enough to preclude our review of the issue altogether absent any reason to excuse the default. *See Magar v. Parker*, 490 F.3d 816, 819 (10th Cir. 2007). But even overlooking all this, we still don't have to resolve whether *Yates* applies to evidentiary errors. We don't because, even assuming it does and even assuming Mr. Banks had preserved it, it fails on the merits. That's because any error was harmless even with respect to the malice aforethought murder charge.

To prevail on its malice aforethought charge, the State did not have to prove that Mr. Banks was the triggerman. *Conover v. State*, 933 P.2d 904, 915 (Okla. Crim. App. 1997). Instead, as the jury was instructed, Mr. Banks could be held liable under an aiding and abetting theory, a theory requiring proof only that he actively aided, promoted, or encouraged the murder and did so with the requisite *mens rea*. *See* Oklahoma ROA at 462-63 (trial court instructing the jury that "[t]o aid or abet . . . implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of th[e] criminal offense").

And for reasons we have already explained, there's ample evidence of that. By his own admission, Mr. Banks drove the vehicle to the site of the abduction. He participated in the rape. He drove the car to the site of the murder and then to the storm drain where Mr. Nelson disposed of the evidence. Although Mr. Banks

- 11 -

would have us believe that Mr. Nelson killed her and that he was ignorant of and didn't share his cohort's intent to kill, a far more reasonable inference from the facts was that Mr. Banks (if he was not the triggerman) encouraged and purposefully helped facilitate the slaying in order to cover up the abduction and rape. When all this is taken together with the fact the state never again mentioned Walter's testimony, we simply cannot say we have a "grave doubt" about the effect of the error on either aspect of his murder conviction.[2]

B

Mr. Banks protests that the error of allowing the prosecutor to question Walter about his putative admission must have swayed the jury at the penalty phase even if it was harmless at the guilt stage. Specifically, Mr. Banks claims that jurors are unlikely to impose a death sentence on a felony murder defendant who did not actually pull the trigger, and so the implication from Walter's testimony must have weighed in the jury's mind at sentencing. And, as Mr. Banks points out, all he needs to demonstrate at this stage is a significant doubt that the error would have swayed even one juror to select the death penalty.

---

[2] Mr. Banks argues that the Supreme Court's decision in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) sets the standard for whether a Confrontation Clause error is harmless. But *Van Arsdall* was a direct review case where the "harmless beyond a reasonable doubt" standard applied. *Id.* In habeas cases, the proper standard is the "substantial and injurious effect" test. *Fry*, 551 U.S. at 119. And even assuming that the *Van Arsdall* factors are relevant to the *Fry* analysis, they still point in favor of harmlessness for the reasons we've already given: the relative unimportance of Walter's (non)-testimony and the strength of the government's case.

- 12 -

*James v. Gibson*, 211 F.3d 543, 554 (10th Cir. 2000).  Even so, we see no room for such doubt here.

The first trouble with Mr. Banks's argument is that his strategy at sentencing didn't involve seeking to mitigate Mr. Banks's role in the crime or suggest some residual doubt about it.  *See* Tr. at 1091, 1093, 1096.  Instead, the defense strategy at sentencing focused entirely on Mr. Banks's family history, his mental health problems, and his behavioral improvement over the years he had spent in prison since the murder.  Defense counsel never argued that the jury should spare Mr. Banks's life because he wasn't the triggerman.  Given counsel's failure to argue a residual doubt theory — which itself is an unchallenged and a surely reasonable strategic choice in this case — it's hard to see how the error could have swayed the outcome of the sentencing proceeding.  *See Matthews v. Workman*, 577 F.3d 1175, 1182 (10th Cir. 2009).  Neither does Mr. Banks provide anything but speculation to support his claim that, absent the claimed error, counsel *would* have proffered a residual doubt defense.

What's more, Mr. Banks's claim that felony murder defendants who aren't actually triggermen rarely get the death penalty rests on a misreading of *Enmund v. Florida*, 458 U.S. 782 (1982).  In *Enmund*, the Supreme Court held that the Eighth Amendment prohibited execution of a defendant whose only participation in the underlying felony was driving the getaway vehicle.  *Id*. at 788.  The Court emphasized that the defendant "did not commit the homicide, was not present

when the killing took place, and did not participate in a plot or scheme to murder" — and that in such circumstances, jurors rarely impose the death penalty. *Id.* at 795. But later case law has made clear that capital punishment for felony murder charges is both constitutional and not infrequently imposed when the defendant was present during the murder and acted with reckless disregard for human life. *Tison v. Arizona*, 481 U.S. 137, 151-58 (1987).

As we have seen, the evidence in this case of Mr. Banks's reckless disregard for Mrs. Travis's life is potent. The evidence at the guilt phase strongly supported the government's theory that Mr. Banks intended Mrs. Travis's death to cover up the abduction and rape. And that evidence was buttressed at the penalty phase by testimony from Mr. Banks's ex-wife explaining that he had shot the cashier of a store he robbed precisely because "dead men tell no tales." And that he had shot the cashier in the head (just as Mrs. Travis was shot in the head) because he "do[esn't] shoot below the neck." All of this suggests that Mr. Banks was the one who shot Mrs. Travis in the head, and that at the very least he intended Mrs. Travis's death to ensure she would not later identify him.

Finally, the jury found a number of aggravating factors in this particular case justifying its death sentence, and all were amply supported by the evidence. First, it found he had been convicted of prior violent felonies, an unassailable conclusion given Mr. Banks accumulated no fewer than eight prior violent felonies ranging from armed robbery to assault and battery to another first degree

- 14 -

murder conviction.  Second, the jury found the murder was committed to avoid lawful arrest and prosecution, a conclusion amply supported both by the circumstances of the crime itself and Mr. Banks's comments to his ex-wife.  And third, the jury found the murder was especially heinous, atrocious, or cruel — a finding difficult to dispute given that Mrs. Travis was kidnaped, raped, and sodomized all before being shot in the head and left in a roadside ditch.  We have no serious doubt that the jury's assessment of any of these factors would have been different if the government had never put Walter Banks on the stand.  And because the challenged testimony did not relate at all to the defense's mitigation case, we likewise find it difficult to see how the jury's assessment of the balance between these aggravators and the mitigating circumstances would have been any different.

III

Separately, Mr. Banks claims that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963).  Mr. Banks's challenge relies upon the state's failure to disclose a note written by a corrections officer who interviewed Mr. Nelson's mother.  The officer wrote that "she told [me] that [Nelson] told her Anthony Banks was the brother to one who did the murder but was not sure."  Mr. Banks argues that this evidence would have given him an opening to pin the murder on his brother Walter during trial.

The OCCA denied Mr. Banks's *Brady* claim on the merits after concluding the note was immaterial. To prevail on a *Brady* claim, it is the defendant's burden to show "a reasonable probability that, had the [exculpatory] evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Burke*, 571 F.3d 1048, 1053 (10th Cir. 2009) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). This materiality showing, the OCCA said, Mr. Banks failed to make given the remaining evidence in the record against him.

Everyone before us seems to acknowledge this decision is entitled to AEDPA deference, at least with respect to the materiality of the note to the guilt phase. Under AEDPA, of course, we may lawfully overturn the OCCA decision only if there was no "reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) (discussing 28 U.S.C. § 2254(d)). At the same time, however, the parties dispute whether the OCCA's decision passed on the materiality of the note to the sentencing portion of Mr. Banks's trial. But in the end nothing hinges on this dispute. Whether viewed through AEDPA's deferential lens or *de novo*, the note was immaterial to either phase of the proceedings. The nub of the problem is that evidence cannot qualify as material without first being admissible or at least "reasonably likely" to lead to the discovery of admissible evidence. *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995). Yet the note at issue here is neither of these things.

- 16 -

First, the note is inadmissible because it contains not one but two layers of hearsay. Mr. Nelson told his mother, who in turn told a corrections department official, that Mr. Banks's brother committed a murder. And the Oklahoma hearsay rules, virtually identical to federal rules, prohibit the introduction of hearsay statements for their truth unless they fall within specifically enumerated exceptions inapplicable here. *See* Okla. Stat. tit. 12 §§ 2801-05.

None of those exceptions pertains here. And for good reason. The note's meaning is far from clear. After all, there were two murders that Mr. Banks was involved in: the one at issue in this case, and also the murder of Daniel Fremin during a convenience store robbery. Mr. Fremin's murder was, we know, committed by *both* Banks brothers. *See Banks v. Reynolds*, 54 F.3d 1508, 1511-13 (10th Cir. 1995). And the note doesn't make it clear whether in speaking of "the murder" Mrs. Banks was referring to the Travis murder or the Fremin murder. In fact, given that Walter Banks *was* indisputably involved in the Fremin murder but no other evidence whatsoever (including the defendant's own account of events) places Walter at the scene of the Travis's murder, it would be reasonable to infer that the note was referring to former, not the latter, murder. And this is precisely the sort of ambiguity the rule against hearsay is designed to avoid introducing into trials.

Mr. Banks replies that the note would have been useful at least to impeach witnesses against him, but he fails to identify any witness he might have

- 17 -

impeached. Certainly not Mr. Nelson, who invoked his Fifth Amendment rights and never took the stand. And certainly not the DNA experts, who were never asked to testify whether Mr. Banks or his brother Walter was the likely killer: all they testified to was that the DNA found at the crime scene matches Mr. Banks and that it is unlikely to match another randomly selected individual. Indeed, the experts freely acknowledged that if a sibling were a suspect further testing would be required. The note thus undercuts none of their testimony, and its usefulness to Mr. Banks could only be for its truth, not its impeachment value. *See United States v. Phillip*, 948 F.2d 241, 250 (6th Cir. 1991) (exculpatory statements were immaterial because they were inadmissible hearsay that "could be useful to the defendant only if offered for their truth").[3]

Pursuing that point, Mr. Banks next replies that the note might have been admissible for its truth in at least the sentencing phase where evidentiary rules are often laxer. But in Oklahoma the rules prohibiting hearsay apply with equal force in the penalty phase of a capital case. *Conover*, 933 P.2d at 921. No doubt, due process may sometimes command the relaxation of state evidentiary rules that exclude highly probative evidence and thereby render the trial fundamentally unfair. *See Paxton v. Ward*, 199 F.3d 1197, 1213-15 (10th Cir. 1999). But in

---

[3] Mr. Banks separately argues that the statement could be used to "impeach" the prosecutor for stating in closing that the Walter Banks defense was likely "born in these lawyers' office last night." It should go without saying that closing arguments of counsel are not evidence and are not subject to cross-examination, let alone impeachment.

*Paxton* and the Supreme Court cases upon which it relies, the evidence was far more reliable than the evidence we have here.

Those cases involved the exclusion of a defendant's polygraph examination that had previously persuaded the district attorney to drop charges, *Paxton*, 199 F.3d at 1216-17, or testimony supported by other corroborating evidence, *Rock v. Arkansas*, 483 U.S. 44, 62 (1987), or statements the state had previously relied upon heavily in its case against a co-defendant, *Green v. Georgia*, 442 U.S. 95, 97 (1979). Here, by contrast, we have only a highly equivocal and entirely uncorroborated double-hearsay statement. It is, as well, a statement inconsistent with the defendant's own statements, statements he asked the jury to credit as true and continues to ask this court to credit. By Mr. Banks's admission, he was present at the abduction and the killing of Mrs. Travis. He claims only that the rape and killing were entirely Mr. Nelson's doing and at no point has he suggested Walter was present. Neither does any other evidence in the case even hint at Walter's involvement. In these circumstances, we are directed to no due process principle or precedent that might command the admission of the warder's double-hearsay note.

Without any persuasive argument the note would have been admissible, Mr. Banks suggests the note at least might have led to the *discovery* of admissible evidence. But the record is devoid of any admissible evidence the defense might have uncovered had they known about the note before trial. And the burden of

presenting such evidence lies with Mr. Banks.  What's more, it's hard to see how the note would have tipped off Mr. Banks to any leads of which he was not already aware of.  After all, by Mr. Banks's admission, he was present at the scene of the crime.  If (contrary to Mr. Banks's version of events) Walter had been present, Mr. Banks would have known that without need of the note.  And so we are left with nothing but speculation that the note might have led the defense to other pertinent information, a possibility that falls short of satisfying the materiality standard.  *See Wood*, 516 U.S. at 6.[4]

IV

Mr. Banks next turns his focus to the penalty phase where, he claims, his expert witness showed up to court intoxicated.  The trial transcript reveals nothing unusual.  But according to affidavits submitted by Mr. Banks's lawyers, clinical psychology expert Dr. Philip Murphy had alcohol on his breath, appeared disheveled, showed up in wrinkled clothing, and spoke in a "halting and unimpressive" manner that was uncharacteristic of the normally well-spoken doctor.  The problem was allegedly so obvious the trial judge allegedly

---

[4] Finally, Mr. Banks suggests that he was at least entitled to a federal evidentiary hearing to demonstrate that he might have been able to uncover some admissible evidence implicating his brother.  But an evidentiary hearing is not a fishing expedition.  Instead, its function is to resolve disputed facts.  And for that reason, a habeas court considering a *Brady* claim "is required to conduct the evidentiary hearing only if the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law."  *United States v. Velarde*, 485 F.3d 553, 560 (10th Cir. 2007).  That, Mr. Banks has not done.

commented that Dr. Murphy appeared to be "a drinking man." Mr. Banks argues that Dr. Murphy's unprofessional appearance torpedoed his credibility in front of the jury, and yet his lawyers never bothered to seek a continuance so the witness could sober up. All of this, Mr. Banks contends, violated his due process right to a competent mental health expert and his Sixth Amendment right to effective assistance of counsel.

The courts to come before us have not considered the merits of Mr. Banks's arguments. They have not because, according to them, Mr. Banks waited too long to raise it. He did not object at trial, did not argue the point on appeal, and failed to include the issue in his first state post-conviction motion. By the time he asserted the claim in his second state habeas petition, the OCCA held the claim was procedurally defaulted. In doing so, the OCCA relied on Okla. Stat. tit. 22 § 1089(D)(8), which allows new claims to be raised in a second or successive habeas petition only if they are based upon newly discovered evidence or if the "legal basis for the claim was [previously] unavailable."

When a state court dismisses a federal claim on the basis of non-compliance with adequate and independent state procedural rules, federal courts ordinarily consider such claims procedurally barred and refuse to consider them. *Clayton v. Gibson*, 199 F.3d 1162, 1170-71 (10th Cir. 1999). A federal court will excuse compliance with state procedural rules only if the petitioner can show good cause and prejudice or establish that our refusal to consider the merits of the

claim would result in a "fundamental miscarriage of justice." *Id*. Mr. Banks argues we should excuse his default because § 1089(D)(8) is neither adequate nor independent, or, alternatively, because he has shown cause and prejudice for the default. We discuss these submissions in turn.

A

In order to bar federal review, a state procedural rule must be adequate to support the judgment and independent from federal law. These dual requirements seek to ensure state rules are not employed to defeat federal court review of constitutional rights. To satisfy the adequacy element, a state procedural rule must be "strictly or regularly followed" and applied "evenhandedly to all similar claims." *Duvall v. Reynolds*, 139 F.3d 768, 796-97 (10th Cir. 1998) (quotation omitted). We have repeatedly held that Oklahoma's procedural default rule meets the adequacy requirement. *See, e.g.*, *Spears v. Mullin*, 343 F.3d 1215, 1254-55 (10th Cir. 2003); *Cannon v. Gibson*, 259 F.3d 1253, 1266 (10th Cir. 2001). In *Spears*, the court found just two cases where the OCCA granted relief on a second or successive post-conviction petition that did not fall within one of § 1089(D)'s enumerated exceptions. *Spears*, 343 F.3d at 1254. Although Mr. Banks points to several cases decided since *Spears* that he believes change the calculus, we just recently considered the effect of these very same cases and concluded that the Oklahoma bar remains adequate. *See Thacker v. Workman*, 678 F.3d 820, 835-36 (10th Cir. 2012). We are of course bound by that decision.

We must likewise reject Mr. Banks's independence objection. A state procedural rule is independent "if it relies on state law, rather than federal law, as the basis for the decision." *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998). In Mr. Banks's case, the OCCA relied only upon the state procedural rule in § 1089(D)(8) to deny relief. Because § 1089 is purely a state law rule, we have held that Oklahoma decisions resting entirely upon § 1089(D)(8) are independent. *See Thacker*, 678 F.3d at 835.

Even so, Mr. Banks argues that the independence analysis is more complicated than it first appears. More complicated because Oklahoma courts have implied a discretionary exception to their procedural rule, one that according to Mr. Banks involves passing judgment on the merits of the federal claim. In support of this claim he relies principally on *Valdez v. State*, 46 P.3d 703 (Okla. Crim. App. 2002), which he takes as standing for the proposition that Oklahoma courts may consider any issues raised upon a second or successive habeas petition to avoid "a miscarriage of justice" or "a substantial violation of a constitutional or statutory right." *Id*. at 710-11 (citing Okla. Stat. tit. 20 § 3001.1). Mr. Banks says that, even though the OCCA in his case did not cite to this exception to the procedural bar, it must have at least implicitly decided the exception did not apply and in doing so may have passed upon the merits of his federal claim.

The difficulty is our case law makes clear that a state procedural bar can be independent of federal law notwithstanding a state court's power to excuse default

in extreme cases.  In *Gutierrez v. Moriarty*, 922 F.2d 1464 (10th Cir. 1991), we considered a New Mexico rule that granted courts discretion whether to review a defaulted claim that implicated a "fundamental right."  *Id*. at 1469.  We held that New Mexico's procedural bar was nevertheless independent because the state was entitled to "exercise[] its discretion not to review the fundamental-right claim," an exercise of discretion driven by state-law principles.  *Id*.  Because the state court "may invoke the procedural bar without the necessity of ruling on the federal constitutional claim," the bar was independent.  *Id*; *see also Gardner v. Galetka*, 568 F.3d 862, 883-84 (10th Cir. 2009).

Here, too, the mere fact Oklahoma courts *might* in some instances make an implicit judgment about the federal claim when choosing how to exercise this discretion does not deprive the procedural bar its independence.  To be sure, in some circumstances federal courts presume that a state court decision hinges on federal law grounds when the basis for the decision is unclear.  *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983).  But that presumption applies only if the state court decision "fairly appears to rest primarily on federal law" or if it is "interwoven with federal law."  *Id.*  Neither can be said of our case.

The OCCA's decision did not "appear[] to rest primarily on federal law," but relied only upon the text of § 1089(D) and never mentioned the possibility of invoking an exception.  *See Gardner*, 568 F.3d at 884.  In responding to our certified question in another case, the OCCA disclaimed that it had considered

- 24 -

any exception when the text of its opinion relied solely on the plain language of § 1089(D). *See Black v. Workman*, Case No. CQ-2012-528 (Okla. Crim. App. Aug 15, 2012). This suggests, at the very least, that the OCCA is not implicitly invoking the exception as a general practice.

Nor does it appear that Oklahoma's limited exception to § 1089(D) is "interwoven with federal law" to such an extent we would have to conclude the OCCA implicitly denied Mr. Banks's claims on the merits. After all, the OCCA has made clear that the exception requires state courts to weigh "the interests of justice" in the event petitioner's claim of error is true against "the importance of the principle of finality of sentences." *Malicoat v. State*, 137 P.3d 1234, 1235 (Okla. Crim. App. 2006). The fact that these are quintessentially state law concerns is illustrated by the fact that the identification of a federal constitutional error is neither a necessary nor a sufficient condition for excusing the default under state law. It is not a necessary condition because the OCCA has conducted the inquiry with reference to whether the allegations *if true* would amount to a miscarriage of justice, and then has found no constitutional violation on the merits even after excusing the default. *See id.* And it is not a sufficient condition because nothing in Oklahoma law suggests that all (or even most) federal constitutional errors will meet the high threshold for "miscarriage of justice" under state law. The fact that the OCCA has excused compliance with the dictates of § 1089(D) only a handful of times in the last several decades supports

- 25 -

this conclusion, suggesting that the court's hurdle is a high one and that the court does not grant petitioners a second bite at the post-conviction apple simply because and whenever a violation of federal law is at stake. *See Thacker*, 678 F.3d at 835-36.

State courts have a strong interest in pursuing justice, ensuring a degree of finality to their judgments, and trying to find an appropriate compromise between these competing considerations, all quite independent of any mandates of federal law. To suggest otherwise would be to suggest there's no mercy a state court could show, no relief it might provide from a procedural rule, and no "pursuit of justice" it might undertake, without necessarily implicating a federal right. That of course simply isn't so. Our federal Constitution is certainly a bulwark of justice. But one can just as certainly seek to pursue justice without depending on its specific provisions or the precedents federal judges have developed interpreting those provisions. So it is we agree with our sister courts that the mere fact that a state court "engages in a discretionary, and necessarily cursory, review under a 'miscarriage of justice' analysis does not in itself indicate that the court" has invoked federal law. *Gunter v. Maloney*, 291 F.3d 74, 80 (1st Cir. 2002); *see also Scott v. Mitchell*, 209 F.3d 854, 868 (6th Cir. 2000) ("The Supreme Court . . . does not find the mere reservation of discretion to review for plain error in exceptional circumstances sufficient to constitute an application of federal law.").

In reaffirming the principle that a state's decision to overlook its procedural rules on rare occasions in the interests of mercy and justice does not automatically open the door to *de novo* federal review, we are also mindful of recent Supreme Court teachings in the area. Although in opinions addressing adequacy rather than independence, the Supreme Court has twice in the last few years reaffirmed the importance of permitting states to preserve just this sort of discretion. In *Beard v. Kindler*, 130 S. Ct. 612 (2009), the Supreme Court held adequate Pennsylvania's rule that fugitives from justice forfeit their legal challenges to their convictions, even though (it appeared) Pennsylvania's application of that rule was discretionary. The Court emphasized the perverse incentives that would flow from a contrary holding: "[s]tates could preserve flexibility by granting courts discretion to excuse procedural errors, but only at the cost of undermining the finality of state court judgments." *Id*. at 618. Faced with that choice, "many States would opt for mandatory rules to avoid the high costs that come with plenary federal review." *Id*. The result would be "particularly unfortunate for criminal defendants, who would lose the opportunity to argue that a procedural default should be excused through the exercise of judicial discretion." *Id*. The Supreme Court reaffirmed this principle in *Walker v. Martin*, 131 S. Ct. 1120 (2011). There, the Court emphasized that if discretionary exceptions to state procedural bars were enough to open the door to *de novo* federal review, "states would be induced to make their rules draconian,"

*id*. at 1130 (quotation omitted) — a result that would impose a sort of Hobson's choice on the states, be entirely inconsistent with a cooperative federalism, and threaten only to leave everybody worse off.

B

Separately, Mr. Banks argues that he has shown cause and prejudice for the default. This is so, he says, because his trial lawyer was constitutionally deficient in failing to request a continuance upon discovering Dr. Murphy was intoxicated and because his appellate lawyer compounded that error by failing to assert an ineffective assistance of counsel claim on direct appeal. Of course, Mr. Banks could have and did not challenge the ineffectiveness of his trial and appellate counsel in his initial post-conviction petition, and so it is *that* default he must show cause for. *See Livingston v. Kansas*, 407 F. App'x 267, 272-73 (10th Cir. 2010) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000)).

The trouble is *Coleman v. Thompson*, 501 U.S. 722 (1991), which holds that habeas petitioners have no constitutional right to post-conviction counsel in the first instance and so deficient performance by whatever counsel they may have ordinarily does not excuse procedural default. *Id*. at 752; *see also Fleming v. Evans*, 481 F.3d 1249, 1255-56 (10th Cir. 2007). We say "ordinarily" because the Supreme Court has recently articulated a "limited qualification" to this previously unwavering rule. In *Martinez v. Ryan*, 132 S. Ct. 1309, 1318-19 (2012), the Court held that when state law prohibits a defendant from presenting a

claim of ineffective assistance of trial counsel on direct appeal, post-conviction counsel's deficient performance in failing to assert the claim on collateral review can serve as cause for the default. Central to the Court's rationale was that the defendant would have been constitutionally entitled to the aid of counsel to help him prepare his ineffective assistance of trial counsel claim on direct appeal. *Id*. at 1317. And although the Court recognized that states have good reason to require ineffective assistance claims to be raised on collateral review instead, it emphasized that "by deliberately choosing to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims." *Id*. at 1318. In these circumstances, deficient performance of post-conviction counsel provides a basis for federal courts to exercise their equitable power to excuse the default and review the claims *de novo*. *Id*.

But *Martinez* was equally clear about what it did *not* hold, and these limitations make clear the case provides no help to Mr. Banks. The Court said in no uncertain terms that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here." *Id*. at 1320. *Martinez* applies only to "a prisoner's procedural default of a claim of ineffective assistance at *trial*," not to claims of deficient performance by appellate counsel. *Id*. at 1315 (emphasis added). And even then, it applies only when "the State barred the defendant from raising the claims on direct appeal," so that post-conviction proceedings are the

petitioner's first opportunity to present the claim. *Id*. at 1320. None of this applies here, because Oklahoma law permitted Mr. Banks to assert his claim of ineffective assistance of trial counsel on direct appeal. *See Le v. State*, 953 P.2d 52, 56 (Okla. Crim. App. 1998). Without the benefit of *Martinez*, *Coleman* tells us that the failure of Mr. Banks's post-conviction counsel to present his claim cannot serve as cause for the default.

V

Mr. Banks also raises an amalgam of other due process challenges to his conviction based on allegedly improper comments made by the prosecutor at trial. In order to prevail, Mr. Banks must show that the comments "sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process." *Duckett v. Mullin*, 306 F.3d 982, 988 (10th Cir. 2002) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Even standing alone, this is a high hurdle. But because the OCCA rejected all of these claims on the merits, Mr. Banks must also show that the OCCA's application of this test was an unreasonable one under § 2254(d). And Mr. Banks has failed to satisfy this doubly deferential standard.

Mr. Banks first contends that the prosecution impermissibly hinted to the jury at Mr. Banks's prior criminal record. The prosecutor told the jury Mr. Banks gave his statement to police to get a "break," to get out of "trouble," to get "help" and to get "relief," comments that surely could make a jury suspect Mr. Banks

was in trouble with the law. But there was nothing improper about the prosecutor's actions. Mr. Banks wasn't acting as a good Samaritan volunteering information about an unsolved crime out of a sense of civic duty. He offered the information implicating Mr. Nelson in the hope of cutting a deal with police on an unrelated robbery charge he was facing at the time. The jury was entitled to know the context in which Mr. Banks made his statement, a context shedding light on his motives for speaking with the police and the likely truthfulness of his claim he had nothing to do with the rape or killing. *See Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (no due process violation where admission of other crimes evidence "was relevant to explain the facts surrounding the . . . murders").

Next, Mr. Banks challenges the prosecution's verbal re-creation of the crime scene during closing argument at the guilt stage. The prosecutor urged the jury to "take all of your senses and use them," to put themselves at the scene of the crime. He conjured up the image of "a young woman, being raped vaginally and anally at the same time, taking turns," "[t]he sound of a gunshot firing," and then "blood streaming" from the face of Sun Travis as her body was dumped in a ditch. This is a gruesome picture, to be sure. But it is also a fair characterization of the evidence in the case. Mr. Banks protests there is no evidence Mrs. Travis was raped by the two men "at the same time, taking turns," but that conclusion is a reasonable inference from the mixture of the two men's semen on her clothing.

- 31 -

*See Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002) (counsel "possesses reasonable latitude in drawing inferences from the record").

Mr. Banks also challenges a host of other comments the prosecutor made during closing argument at the guilt phase. At various points, the prosecutor characterized Mr. Banks as a "wild animal that stalks its prey," "a predator who lurks in the shadows," a "monster" who selects the most helpless victims, and a "Mafia style" killer. The prosecutor, as well, offered various disparaging comments about defense counsel's tactics. And, to be sure, some of these comments are highly questionable at best: for example, this court and the Supreme Court have already chastised counsel for calling a defendant an "animal." *Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986); *Wilson v. Sirmons*, 536 F.3d 1064, 1118 (10th Cir. 2008). Even so, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (quotation omitted). To make out a constitutional due process violation warranting reversal of a jury's verdict, the comments must so infect the entire proceedings as to "impede the jury's ability to judge the evidence fairly." *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 570 (10th Cir. 2000), *overruled on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001) (en banc). And however improper we cannot say the comments did that. The prosecutor devoted the bulk of his challenged closing argument to laying out the evidence of Mr. Banks's guilt in a careful manner — evidence that

was very strong. The court instructed the jury to base its decision only on the evidence, and not the statements of counsel. And it's hard to see how the prosecutor's statements would have, in any event, done much to inflame the jury's passions above and beyond their reaction to the gruesome crime itself. In light of all this, we cannot condemn as unreasonable the OCCA's decision that the admittedly improper comments did not so taint the trial as to render it fundamentally unfair. *See Hooper*, 314 F.3d at 1173; *see also Wilson*, 536 F.3d at 1121 (improper comments by prosecutor harmless where evidence of guilt "was overwhelming").

Turning from the guilt to the penalty phase, Mr. Banks claims the prosecution's use of a demonstrative exhibit summarizing his prior convictions unfairly prejudiced him. But he concedes the contents of the exhibit and the introduction of his prior convictions to the jury were correct. He argues instead and only that the title of the exhibit, "trail of terror," printed in bold red letters, unfairly prejudiced him. But even assuming without deciding the title was over the line, this is the sort of minor impropriety that doesn't warrant the reversal of a conviction, particularly on federal habeas review many years after the fact. *Cf. Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) (upholding as reasonable OCCA's finding of no violation of due process where prosecutor stated at sentencing "is [defendant] a threat to society? Don't bet your lives on it"). Though Mr. Banks asserts that the invocation of "terror" frightened the jury into a

death sentence, this is belied by the jury's rejection of the "continuing threat to society" aggravator. All indications from the record are that the jury carefully weighed the evidence before it.

Mr. Banks's remaining challenge is somewhat more meritorious: he argues that the prosecutor impermissibly commented on his silence. During the closing argument of the penalty phase, the prosecutor sought to rebut Mr. Banks's supposed religious conversion. To show the conversion was insincere, the prosecutor told the jury that "not once, not in the '70s, not in the '80s, not in the '90s, not last week, not this week, has he come forward to be accountable for what has taken place." The trial court overruled the defense's objection, and the prosecution continued, "you judge that, on the conversion and what that means, and the fact that he has not been held accountable or has said anything even remotely — willing to come forward and say what happened." Only then did the trial judge sustain the objection and admonish the jury to "disregard the last statement."

The OCCA held these statements improperly but harmlessly commented on Mr. Banks's silence in violation of the Fifth Amendment. And once again we cannot say we have a grave doubt as to the effect of this assumed error on the sentence. Although the trial judge failed to sustain the defendant's first objection, the judge quickly reversed course and issued a curative instruction. Mr. Banks argues that the curative instruction only told the jury to disregard the

"last statement," and that the jury might have thought the first comment about Mr. Banks not taking responsibility for his actions was admissible. But any possible ambiguity about the scope of the trial judge's admonition was addressed the jury instructions at the end of trial, instructions which made it abundantly clear the defendant's silence couldn't be used against him in any way:

> The defendant is not compelled to testify, and the fact that a defendant does not testify cannot be used as an inference of guilt and should not prejudice him in any way. You must not permit that fact to weigh in the slightest degree against the defendant, nor should this fact enter into your discussions or deliberations in any manner.

Oklahoma ROA at 482. The law presumes juries follow instruction. *United States v. Castillo*, 140 F.3d 874, 884 (10th Cir. 1998). Indeed, this court has previously held that it isn't unreasonable for a state court to conclude that the prosecution's comments on a defendant's right to silence was harmless when the jury is instructed to disregard such comments. *See Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001). We see no way we could hold otherwise here and Mr. Banks never even mentions, much less attempts to distinguish, this precedent.[5]

---

[5] Mr. Banks separately faults his trial counsel as ineffective for failing to object to some of these allegedly improper comments. But the OCCA addressed all these comments *de novo* despite the absence of any contemporaneous objection, ultimately finding them harmless. Because we agree with this harmlessness assessment, any alleged ineffectiveness by counsel resulted in no constitutionally qualifying prejudice. *See Spears*, 343 F.3d at 1250-51.

## VI

Finally, we consider whether the cumulative effect of the errors requires reversal even if each individual error was harmless. We conclude that even taking all of the errors we have identified or assumed, we have no grave doubt about the outcome of the case. With respect to the guilt phase, the only errors we have identified were the decision to allow Walter Banks to testify and the prosecution's disparaging remarks about Mr. Banks and defense counsel. But for reasons we have explained none of the errors cuts to the core of the government's powerful case, a case which relied upon DNA evidence and Mr. Banks's own statements about his presence at the crime scene. Similarly, at the penalty phase the jury's decision to impose the death penalty was predicated upon three statutory aggravating factors, each sustained by substantial evidence. Any lingering prejudice from guilt-phase errors was minimal at best given counsel's failure to advance a residual doubt theory, and as we have said the jury instruction largely cured any harmful effects of the prosecution's improper comments about Mr. Banks's silence. Mr. Banks may not have received a perfect trial, if such a thing exists. But he did receive a trial that complied with the Constitution and laws of the United States, and more than that we cannot compel.

Affirmed.